**ASHTABULA COUNTY MEDICAL CENTER, Plaintiff,**

v.

**Tommy G. THOMPSON, Secretary of Health and Human Services, Defendant.**

**No. 1:00CV1895.**

United States District Court,
N.D. Ohio,
Eastern Division.

Feb. 8, 2002.

David M Levine, Benesch, Friedlander, Coplan & Aronoff, Cleveland, for Ashtabula County Medical Center, Plaintiffs.

Michael Anne Johnson, Office of the United States Attorney, Northern District of Ohio, Cleveland, for Donna Shalala, Defendants.

*MEMORANDUM AND ORDER*

ALDRICH, District Judge.

The plaintiff, Ashtabula County Medical Center ("ACMC"), brought this action against the Secretary of Health and Human Services, Tommy G. Thompson ("the Secretary"),[1] seeking judicial review, under

---

1. Pursuant to Federal Rule of Civil Procedure 25(d), Tommy G. Thompson, the current Secretary of Health and Human Services, is automatically substituted for Donna E. Shalala, the Secretary at the time suit was filed, as the defendant in this action. Fed. R. Civ. Pro. 25(d).

42 U.S.C. § 1395oo(f) and 42 C.F.R. § 405.1877(f), of a final administrative agency decision by the Provider Reimbursement Review Board ("PRRB" or "Board") denying ACMC's request to be classified as a "new provider" under 42 C.F.R. § 413.30(e)[2] ("the new provider rule"). Now before the Court are the parties' dueling motions for summary judgment (Doc. # 8, 11). For the following reasons, this Court grants ACMC's motion (Doc. # 8) and denies Thompson's motion (Doc. # 11).

## I. Background

The facts in this case are uncontested. Both parties stipulated to the relevant facts in a hearing before the Board, and the Court agrees with the parties that there is no dispute as to any material factual issues. ACMC is a hospital located in Ashtabula, Ohio. In May, 1995, ACMC entered into an "Agreement for Purchase of the Right to Operate Nursing Home Beds" with the County Commissioners of Ashtabula County, the owners of the Ashtabula County Home ("ACH"), under which ACMC acquired the right, title, and interest to fifteen of ACH's 310 beds at a price of $7500 per bed. ACMC and ACH are separate and unrelated health care institutions, and ACMC acquired no other assets from ACH. Under Ohio law, which has imposed a moratorium on nursing facility beds in the state of Ohio, ACMC was required to purchase existing beds from another provider and apply for a certificate of need ("CON") before commencing operations. It applied in June 1995 for a CON granting it authority to acquire, relocate, and place into service fifteen long-term care beds on its premises, and the application was granted in October 1995. ACMC, which had not operated as a nursing facility or a skilled nursing facility ("SNF") previously, became Medicare-certified on March 27, 1996. When ACMC began operating its SNF,[3] no ACH personnel became ACMC employees or managers. ACH continued to operate as a distinct entity, without any change in its licensure or certification. Furthermore, no ACH residents were transferred to ACMC when ACMC began operating the SNF. Rather, all of the admissions and residents of ACMC's distinct part SNF during the first six months of operation had home addresses within Health Service Area ("HSA") # 10, one of the ten regions into which Ohio is divided for the purposes of administering the CON program. Both ACH and ACMC are located within HSA # 10, about seven miles from one another.

In July 1996, ACMC submitted a request for an exemption under the new provider provision from the routine cost limits ("RCLs") applicable under the Medicare statutes. The new provider provision is an exemption from the statutory caps placed on Medicare reimbursement for health care providers, who, under the Medicare program, are generally reimbursed up to the statutory limit for their reasonable costs in providing necessary health care services. On July 25, 1996, the Health Care Financing Administration ("HCFA")[4] denied the request. ACMC appealed to the PRRB, which affirmed HCFA's decision. The Board's opinion became the final decision of the Secretary

---

2. During the relevant time period, the new provider rule appeared at 42 C.F.R. § 413.30(e). It has since been moved, after certain amendments not relevant here, to 42 C.F.R. § 413.30(d). The Court refers to the previous version of the rule throughout this order.

3. SNFs are more commonly referred to as nursing homes.

4. HCFA is being renamed "The Centers for Medicare and Medicaid Services." In this order, however, the Court refers to that institution as HCFA, its name during the relevant time period.

pursuant to 42 U.S.C. § 1395oo(f)(1). ACMC now seeks judicial review of the PRRB's determination that ACMC does not qualify for a new provider exemption to the RCLs.

## II. Standard

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to demonstrate the existence of a material dispute as provided in Rule 56(e):

> [a]n adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Parties opposing summary judgment must go beyond the pleadings and produce some type of evidentiary material in support of their position. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

In determining whether a genuine issue of material fact exists, this Court must view the evidence in a light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White*

*v. Turfway Park Racing Assn.,* 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Determination of whether an issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the Court must decide whether the evidence is such that "reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict" or whether the evidence is "so one-sided that [the moving party] must prevail as a matter of law." *Id.* at 252, 106 S.Ct. 2505. Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

■ The Board's decision must be reviewed under the standard established by the Administrative Procedure Act ("APA"). 42 U.S.C. § 1395oo(f)(1) (1996). Under the APA, agency decisions may only be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or are "unsupported by substantial evidence in a case ... reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(A), (E); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413–15, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Court may consider evidence in the record as a whole, even if not discussed by the agency decisionmaker. *Queen City Home Health Care Co. v. Sullivan,* 978 F.2d 236, 243 (6th Cir.1992).

■ An agency's interpretation of the statutes it is entrusted to administer is entitled to great deference. *See Chevron,*

*U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (finding that "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of the agency," but rather should sustain that interpretation as long as it is "a permissible construction of the statute"). In cases where an agency's interpretation of its own regulations is at issue, increased deference is warranted, and the agency's interpretation should be entitled to "controlling weight" unless "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. Hosp. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *see also Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). Furthermore, deference is especially warranted where an agency regulation "concerns 'a complex and highly technical regulatory program'" such as Medicare. *Thomas Jefferson Univ. Hosp.,* 512 U.S. at 512 (quoting *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 697, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991)). Nonetheless, a district court has a duty to review an agency's interpretation of its own regulations, and should reverse an agency determination where "an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.'" *Id.* (quoting *Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988)). Finally, *Auer* deference is not

warranted unless the language of the regulation is ambiguous. *Christensen v. Harris Cty.,* 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

## III. Analysis

The only real issue in this case is whether ACMC, by virtue of acquiring fifteen beds from ACH to establish a new SNF program, became a new provider for purposes of the new provider exemption, as ACMC contends, or merely effected a change of ownership ("CHOW") of an institution previously existing for over three years, as the Secretary contends.[5] The Court can only reverse the Board's determination that ACMC is not entitled to the exemption if that conclusion was contrary to the plain meaning of the regulation or was arbitrary, capricious, or unsupported by substantial evidence. A brief survey of the Medicare reimbursement scheme and of the Ohio CON program is appropriate before addressing the discrete question presented.

### A. Medicare and the Ohio CON Program

In 1965, Congress enacted the Medicare program, a federally funded and administered health insurance program for the elderly and certain disabled persons. *See* 42 U.S.C. § 1395 *et seq.* (1996). HCFA is the agency through which the Secretary administers the Medicare program. Under Part A of the Medicare program, a SNF is reimbursed for the reasonable

---

**5.** Whether a provider that purchases CON rights from another, unrelated provider for purposes of creating a new SNF program is entitled to the new provider exemption is a question of first impression in this jurisdiction and is an issue still novel to the federal courts in general. To date, the Secretary's interpretation excluding all providers that purchase CON rights from another provider from the definition of "new provider" has been upheld in *Paragon Health Network, Inc. v. Thompson,*

251 F.3d 1141 (7th Cir.2001), *Maryland General Hospital, Inc. v. Thompson,* 155 F.Supp.2d 459 (D.Md.2001), and *Larkin Chase Nursing & Restorative Center v. Shalala,* No. 99–00214 (D.D.C. Feb. 6, 2001). One court has reversed a Board determination relying on the Secretary's interpretation. *See South Shore Hosp. v. Thompson,* No. Civ.A. 99–11611–JLT, 2002 WL 69487 (D.Mass. Jan.3, 2002).

costs of the services it provides, defined as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." *Id.* § 1395x(v)(1)(A).[6] The Secretary was given wide latitude to formulate rules and regulations governing these disbursements. The regulations make clear that the scope of the program is intended to be broad, providing reimbursement for actual costs as long as they are not out of line with costs incurred by similar institutions. *See, e.g.,* 42 C.F.R. § 413.9(c)(3) ("The reasonable cost basis of reimbursement contemplates that the providers of services would be reimbursed the actual costs of providing quality care however widely the actual costs may vary from provider to provider and from time to time for the same provider.").

Prior to 1972, institutions were generally reimbursed their actual costs, which were found to be reasonable as long as they were "allowable" under the early regulations. In 1972, however, Congress determined that that system gave providers little incentive to operate efficiently, and, responding to a dramatic rise in Medicare expenditures, amended the statute in an effort to contain costs. *See St. Francis Health Care Centre v. Shalala,* 205 F.3d 937, 940 (6th Cir.2000) (summarizing Congress's efforts to refine the Medicare program). Congress therefore amended 42 U.S.C. § 1395x(v)(1)(A) to exclude from the definition of reasonable cost any costs "found to be unnecessary in the efficient delivery of needed health services." Congress also authorized the Secretary of what is now known as the United States Department of Health and Human Services to "provide for the establishment of limits based on estimates of the costs nec-

essary in the efficient delivery of needed health services." Social Security Amendments Act of 1972, Pub.L. No. 92–603, 86 Stat. 1329. The Secretary was thus empowered to establish caps, then known as "Section 223 cost limits," above which costs were assumed to be unreasonable. In 1984, Congress itself imposed statutory limits on Medicare reimbursement of a SNF's routine service costs, known as RCLs. Since 1972, the Secretary has also adopted numerous regulations providing for exemptions from and exceptions to these reimbursement limits to reflect identifiable circumstances in which a provider's costs reasonably can be expected to exceed the statutory limits. The new provider rule at issue in this case is an example of one of these exemptions.

The federal statutes, rules, and regulations only tell part of the story, however, since health care facilities are also subject to a wide variety of state laws. In Ohio, health care providers must obtain a CON—essentially a license from the appropriate state agency—before undertaking certain "reviewable activities." *See* Ohio Admin. Code § 3701–12–01 et seq. Operation of nursing facility beds is one such activity, and, because of Ohio's moratorium on new nursing home beds, facilities hoping to operate beds must obtain CON rights from other facilities. About four out of five states have a CON program, a moratorium, or both. *Milwaukee Subacute & Rehab. Ctr.,* PRRB Dec. No. 98–D40, at 6, 1998 WL 191131 (Apr. 14, 1998).

## B. The Parties' Interpretations of the New Provider Exemption

The new provider exemption reads as follows:

---

6. For cost reporting periods beginning on or after July 1, 1998, SNFs receive payment under a prospective payment system rather than on a reasonable cost basis. 42 U.S.C. § 1395yy(e). The reasonable cost basis applied during the time period relevant here.

Exemptions from the limits imposed under this section may be granted to a new provider. A new provider is a provider of inpatient services that has operated as the type of provider (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than three full years.

42 C.F.R. § 413.30(e) (2000). The Secretary interprets this provision to mean that ACMC, by purchasing and relocating CON operating rights to 15 previously licensed long-term care beds, has merely effected a CHOW of a provider that has been operating for more than three years. The Secretary's interpretation is buttressed by provisions of the Provider Reimbursement Manual ("PRM"), a manual issued by the Secretary that serves as an interpretive guide to the Medicare statute and regulations, *see Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101–02, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995). The PRM sheds further light on the Secretary's interpretation of the new provider regulation:

> Disposition of all or some of an institution or institutional complex or its assets (used to render patient care) through sale, scrapping, involuntary conversion, demolition or abandonment if the disposition affects licensure or certification of the institution or institutional complex is considered a CHOW. For example, an institution or institutional complex purchases the right to operate (i.e., a certificate of need) long-term care beds from an existing institution or institutional complex (be it opened or closed), that has or is rendering skilled nursing or rehabilitative services to establish (in whole or part) a long term care facility or to enlarge an existing long-term care facility.

PRM § 2533.1 E(1)(b).[7] The Secretary further notes that ACMC's CON application itself described the project as "a 15 bed skilled nursing facility to be relocated to our 246 acute beds." Def. Tommy G. Thompson's Reply Mem. in Supp. of His Cross–Mot. for Summ. J. & in Opp. to Pl. Mot. for Summ. J. at 5 ("Def.Reply"). The Secretary argues that this interpretation of the new provider exemption is either in keeping with the plain meaning of the regulation's language or, in the alternative, that the regulation is ambiguous and that this interpretation is reasonable.

ACMC, on the other hand, argues that the Secretary's interpretation is clearly erroneous and inconsistent with the plain language of the regulation in that the phrase "provider of inpatient services" cannot be understood to refer to CON operating rights but rather must refer to an institution—ACMC in this case. ACMC suggests that only a tortured interpretation of the plain English meaning of the term "provider" could lead to the conclusion that an attribute or group of attributes of an institution could constitute a provider for purposes of the exemption. Furthermore, ACMC argues, the Secretary's interpretation directly contravenes the mandate of the Medicare statute that providers be reimbursed their actual reasonable costs, and that it does so in a particularly impermissible way, that is, by tying the ability to qualify for the new provider exemption to the vagaries of state law, since not all states have a CON program, a moratorium, or both. ACMC recognizes that the Board and the HCFA administrator have, on a number of occasions, held that sale of CON operating rights constitutes a CHOW for purposes of the new provider exemption, but argues

---

**7.** This provision of the PRM, which was not effective until September, 1997, was not in effect during the cost reporting periods at issue in this case. The Court will therefore only consider it inasmuch as it represents the Secretary's current interpretation of the new provider exemption regulation.

that in each of these instances, the Board and administrator erred.

## C. Ambiguity

In support of its argument that the Secretary's interpretation of the new provider exemption is contrary to the plain meaning of the regulation, ACMC relies partly on definitions found in other parts of the statute and handbook and partly on common sense. While both parties recognize that the regulation at issue does not define the term "provider," ACMC points to the general definition of "provider of services" applicable to the Medicare statute, which states that "[t]he term 'provider of services' means a hospital, critical access hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, [or] hospice program," 42 U.S.C. § 1395x(u) (Supp.2001), and to the definition of "skilled nursing facility" elsewhere in the statute as "an institution (or a distinct part of an institution) which [provides certain services]," Id. § 1395i-3(a). As ACMC further notes, the provisions of the PRM in effect during the relevant time period provided that "[a] new provider is an institution that has operated in the manner for which it is certified in the program (or the equivalent thereof) under present and previous ownership for less than 3 full years." PRM § 2604.1. These definitions, ACMC argues, suggest that "provider" must refer to some sort of institution or part of an institution, but could not refer solely to some attribute or attributes of an institution. This interpretation is, according to ACMC, in accordance with both common sense and normal usage of the English language.

The Secretary takes the opposite view. The Board rejected ACMC's "constricted interpretation" of the term provider and concluded that "the proper application of the regulation necessitates an examination of the previous owner's operation to determine whether or not [ACMC] meets the regulatory requirement of having not operated for more than three full years as the type of provider for which it is certified." *Ashtabula Cty. Med. Ctr. v. Blue Cross & Blue Shield Assoc./AdminaStar Fed., Inc.,* Case No. 97–0407, at 11 (P.R.R.B. June 29, 2000). The Board, without determining whether the term "provider" was ambiguous, apparently agreed that ACMC's purchase of CON rights constituted a relocation of part of a SNF, and that tacking ACH's years of operation as a SNF to ACMC's was therefore warranted. The Secretary now relies heavily on the Seventh Circuit's decision in *Paragon Health Network v. Thompson,* 251 F.3d 1141 (7th Cir.2001), to support this position.

In *Paragon,* the Seventh Circuit concluded that the term "provider" as used in the regulation is ambiguous and that the Secretary's interpretation was therefore entitled to controlling weight as long as it was not plainly erroneous or inconsistent with the regulation. *Paragon,* 251 F.3d at 1148. The Seventh Circuit did not consider the definitions of "provider of services" and "skilled nursing facility" in the Medicare statute, and relied instead on a series of hypotheticals to determine ambiguity:

Paragon is correct that a nursing "provider" is composed of many different attributes, but changing one or more of these characteristics does not mean that the SNF becomes a different "provider." For example, if a facility fires all its staff and hires a new one, but makes no other changes, an ordinary user of the English language probably would consider the SNF with the new staff to be the same "provider" as it was before. Similarly, a SNF that replaced all of its old equipment with new models would still be the same "provider" as it was before the modernization. Even if a SNF both fired its staff and replaced all of its equipment, one might still call it the same "provider" if the administra-

tion and physical plant remained the same. Of course, if all the various things that make up a SNF were new in the sense that they had not been part of another facility, then one would have to call that SNF a "new provider." Conversely, if a nursing facility did not change any of its aspects, it would unquestionably continue to be the same provider rather than a new one. The difficulty in drawing a line between these two extremes is what makes the word "provider" ambiguous as used in the regulation.

*Paragon*, 251 F.3d at 1148. This Court respectfully disagrees with the Seventh Circuit's analysis. That analysis appears to conflate the questions whether the term "new provider" is ambiguous and whether the term "provider" as used in the phrase "provider of inpatient services" is ambiguous. The Seventh Circuit's reasoning ac-

tually focuses on the difficulty of drawing the line between the "same 'provider'" and a "new provider." This inquiry relates more to the ambiguity of the term "new" than the ambiguity of the term "provider." The regulation is entirely unambiguous about the meaning of the term "new," however. Under the plain terms of the regulation, a "new" provider is one that has existed "under present and previous ownership, for less than three full years." The inquiry should focus instead on the meaning of the term "provider," which this Court finds to be unambiguous. Relevant definitions elsewhere in the statute and PRM as well as ordinary English usage lead this Court to conclude that the term provider can only be understood to refer to an institution or distinct part of an institution, not to a mere characteristic or attribute of such an institution.[8] The relevant inquiry is simply whether a second, new

---

8. Focusing on the nature of the word "provider," the very series of hypotheticals posed by the Seventh Circuit leads to the conclusion that that term is unambiguous. The first three scenarios posited by the court are examples of one institution taking certain actions that fail to create any new institution, and the court sensibly concluded that these actions would not result in the creation of a "new provider": "a facility" fires all its staff and hires a new one; "a SNF" replaces all of its old equipment; "a SNF" both fires all its staff and replaces its old equipment, but retains the same administration and physical plant. In each of these examples, some institution ("a facility" or "a SNF") changes some—maybe even many—of its characteristics, but remains in existence as that same institution, without giving rise to any new institution. In the court's final hypothetical, however, "all the various things that make up a SNF" are new, and the court rightly concluded that such a scenario would evidence the creation of a "new provider." In this case, the Seventh Circuit described not just one facility that changes certain of its characteristics but ultimately remains the same institution; rather the court put forth a scenario involving a second, distinct entity where all the various

things that make up a SNF are new. Perhaps the old institution is gone, and perhaps not, but that is of little consequence. The question is whether a second, new institution—a "new provider"—has come into existence, and in the court's final hypothetical, one clearly has.

This Court is not convinced that there exists some broad middle ground between these two "extremes" that could justify finding that the term "provider" is ambiguous and could ever mean anything less than an institution or distinct part of an institution. The Secretary, however, argues that the term "institution" is no more helpful than the term "provider," since institutions too are made up of many different attributes and characteristics and can only be ambiguously described. The Court does not share the Secretary's conveniently postmodernist view of the English language, however, and is optimistic that the word institution can generally be understood by the ordinary user of English, as well as by the ordinary lawyer or administrator, in a reasonably precise manner. *See* Black's Law Dictionary 800–01 (6th ed.1990) (defining "institution" as "[a]n establishment, especially one of eleemosynary or public character or one affecting a community [or an] established or organized society or corporation").

institution has come into existence as a result of the transaction.[9]

Because the Seventh Circuit found ambiguity in the term "new provider," it had little reason to consider other definitions of the word "provider" in the applicable statutes and regulations. These definitions, however, provide ample support for the common sense interpretation above. As ACMC notes, the Medicare statute defines the term "provider of services" as "a hospital, critical access hospital, *skilled nursing facility,* comprehensive outpatient rehabilitation facility, home health agency, [or] hospice program." 42 U.S.C. § 1395x(u) (Supp.2001) (emphasis added). Since the new provider regulation defines a new provider as a *"provider of* inpatient *services,"* the definition of "provider of services" is certainly instructive. Furthermore, this case involves the "skilled nursing facility" part of the definition of "provider of services," and "skilled nursing facility" is further defined as *"an institution* (or *a distinct part of an institution* ) which [provides certain services]." *Id.* § 1395i–3(a) (emphasis added). The applicable definitions in the Medicare statute thus confirm the plain English meaning of the regulation. Likewise, the PRM—the guide to the Secretary's interpretation of the statute and regulations—stated, during the relevant time period, that a "new provider is *an institution* that has operated .... " PRM § 2604.1 (emphasis added). The Court therefore concludes that the term "provider" is unambiguous and must refer to an institution (or distinct part of an institution), not merely to a characteristic or attribute of such an institution.

Furthermore, the statutory definitions and the PRM interpretation effective during the relevant period indicate that Congress and the Secretary intended the term provider to refer to an institution or distinct part thereof and that the Secretary's new twist on that definition is contrary to "other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. Hosp.,* 512 U.S. at 512, 114 S.Ct. 2381.

■ Applying the plain meaning of the regulation, the term provider refers to the institution applying for the exemption—ACMC's new distinct part SNF—not merely to its intangible characteristics or attributes—the CON rights purchased from ACH, which allowed it to come into existence. Because ACMC's distinct part SNF did not exist until ACMC purchased the CON rights from ACH, it qualified as a new provider under the provisions of the new provider exemption regulation. The Board's decision was therefore contrary to the plain meaning of the regulation.

**D. Reasonableness of the Secretary's Interpretation**

■ Although the Court finds that the terms "new provider" and "provider" are unambiguous, the Court also notes that the Secretary's interpretation could not stand even if the terms were ambiguous, since denying new provider status based solely on the transfer of CON rights is plainly erroneous and inconsistent with the text. The parties both make numerous policy-oriented arguments that are instructive in deciding this question, but the Sec-

---

**9.** That this definition can be simply and unambiguously stated does not by any means suggest that there will not be cases that present more difficult facts, such as those at issue in *Paragon,* for example. This case, however, is a good example of how straightforward the regulation actually is. The only preexisting "characteristic" or "attribute" of ACMC in this case is the intangible CON rights. ACMC's SNF is an entirely new institution, complete with a new staff, new equipment, new management, and so on. The ACH transaction created an entirely new institution, and that institution qualifies as a new provider under the plain terms of the regulation.

retary makes an antecedent observation that is well-taken. Policy arguments going to the question whether the specific costs claimed by ACMC's SNF are unreasonable or unnecessary in the efficient delivery of needed health services are only indirectly relevant. The real issue is whether the Secretary's interpretation of the new provider exemption regulation is reasonable. Since the Secretary must interpret the regulations in accordance with the mandate of the statute, policy considerations concerning the efficiency of health services must play some part in this determination, but these considerations can only be used to determine whether the Secretary had some reasonable basis for interpreting the new provider exemption regulation to exclude as a class all providers that purchase CON rights from another, unrelated provider that has existed for more than three years from the reaches of the exemption, not whether it was reasonable to deny the exemption based on ACMC's specific costs.

ACMC makes two main arguments in support of its position. First, it argues that the statutory touchstone of the Medicare program is reimbursement of a provider's actual reasonable costs. The RCLs set caps above which costs are assumed to be unreasonable, but the Secretary has the authority to create exemptions such as the new provider exemption. Once the Secretary does so, ACMC appears to argue, he is obligated to reimburse a provider its actual costs. In other words, ACMC argues that the Secretary has already determined that costs such as those incurred by

ACMC should be considered exempt from the presumption of unreasonableness but that the Secretary is now attempting to disallow the exemption in an allegedly ad hoc way based on the general terms of 42 U.S.C. § 1395x(v)(1)(A), which states that costs found to be unnecessary in the efficient delivery of needed health services are not reimbursable. This argument suffers from two fatal flaws, however. First, it begs the question by assuming that ACMC qualifies as a new provider under the terms of the regulation. Second, it focuses on the reasonableness of ACMC's costs rather than on the reasonableness of the Secretary's decision to exclude providers like ACMC as a class from the reaches of the exemption, as noted above.[10]

ACMC's second argument is much stronger, however. ACMC argues that it is simply irrational, arbitrary, and capricious for a new provider determination to depend on the effect of a state CON program or moratorium. In particular, ACMC notes that the Secretary has made no findings of fact suggesting that purchasers of CON rights are less deserving of the exemption than other new providers. The Secretary, on the other hand, argues that his determination did not use Ohio's CON program as a criterion for judging the reasonableness of ACMC's SNF's costs. Rather, any inconsistencies caused by the existence of state CON programs or moratoria are the result of rational distinctions that the Secretary is allowed to consider.

10. The Secretary's response to this argument suffers from the same faulty reasoning, however. The Secretary suggests numerous times that ACMC was not denied the exemption because of macroeconomic policy considerations but simply because ACMC's costs exceeded the RCLs. This reply similarly begs the question in that it assumes that ACMC does not qualify as a new provider under the language of the regulation; if it does, of course, the fact that ACMC's expenses exceeded the RCLs is essentially irrelevant. The question for the Court to decide here is whether the Secretary's interpretation of the statute—one that excludes providers like ACMC from the exemption's reach—was arbitrary or capricious.

The new provider exemption is intended "to allow a provider to recoup the higher costs normally resulting from low occupancy rates and start-up costs during the time it takes to build its patient population." *Maryland Gen. Hosp. Transitional Care Ctr. v. Blue Cross & Blue Shield Assoc.,* Case No. PRRB 99–D69, 1999 WL 33105616, at * 7 (HCFA Admin. Nov. 22, 1999). The Secretary admits not having made specific factual findings that exempting from the RCLs providers that purchase CON rights from unrelated providers that have existed for more than three years would be contrary to this stated purpose, but the failure to do so is not, as ACMC appears to suggest, fatal to the Secretary's interpretation. On the other hand, specific findings of fact could have bolstered the reasonableness of the Secretary's interpretation, which the Secretary now attempts to prove with general and somewhat hypothetical assertions.

For example, the Secretary argues that a state's decision to issue a moratorium on SNF beds can be interpreted as a finding by the state that additional beds are unnecessary to the efficient delivery of needed health services, and that he could reasonably rely on that finding to exclude all providers in ACMC's position from the reaches of the new provider exemption. This position is noticeably difficult to reconcile with the general goal of uniformity underlying the Medicare statute. *See Maximum Home Health Care, Inc. v. Shalala,* 272 F.3d 318, 321 (6th Cir.2001) ("The purpose of a regulatory scheme such as Medicare is to provide uniform rules by which all participants may be treated equally."). If the Secretary were able to advance some legitimate reason to support this aberration, it would be entitled to great deference. As it stands, the Secretary's justification is based on little more than a generous amount of conjecture and guesswork. The Secretary argues that a state that chooses to impose a moratorium on SNF beds can reasonably be assumed to have determined that additional beds are not necessary to the efficient provision of needed health care. Since the new provider exemption is essentially a subsidy to offset the startup costs of creating new SNF capacity, the state's determination that additional SNF capacity is unnecessary could only lead to the conclusion that additional money spent on SNF startup costs is also unnecessary. Thus, the Secretary argues, exclusion of all providers in ACMC's position from the reach of the exemption is not only rational, but desirable.

The Seventh Circuit agreed with the Secretary's position in *Paragon,* specifically finding that the Secretary could rely on the state's determination that no new nursing facilities were necessary to support his decision. *Paragon,* 251 F.3d at 1150. In the same breath, however, the court dismissed the provider's argument that, if the Secretary could rely on the state's determination with regard to the moratorium, he could also rely on the state's determination in approving the sale that the transfer of CON rights to a new provider was beneficial to the public. The court explained that "there is no evidence that Wisconsin's approval of the transfer of beds was made under the strict standard [of necessity] imposed by 42 U.S.C. § 1395x(v)(1)(A)." *Id.* This observation is sensible enough, since a state may make decisions that affect SNF services for any number of reasons completely unrelated to the efficient delivery of needed health services, including concerns about quality, a desire to encourage other kinds of care (on political or philosophical rather than economic grounds), or simple lack of funds. As a result, it is unclear why it would be appropriate for the Secretary to rely on the state's decision to impose a moratorium in determining, as a blanket rule, whether providers that purchase CON

rights from other providers create costs that are inefficient or unnecessary.

The Secretary must advance some other reason to justify the conclusion that such providers create costs that are unnecessary or inefficient, or otherwise unworthy of the exemption to compensate for startup costs that the regulation suggests they deserve. The Secretary offers two such arguments. First, the Secretary appears to adopt the argument accepted by the Seventh Circuit that purchasing CON rights from another provider serving the same population merely shifts preexisting SNF services around, resulting in no public benefit. *See Paragon*, 251 F.3d at 1149–50. In *Paragon*, however, both the seller of CON rights and the purchasing institution were owned by the same provider. This relationship, while not central to the Seventh Circuit's analysis, was considered by the court, *Paragon*, 251 F.3d at 1144, and it was implicit in the court's analysis concerning the policy behind the new provider exemption. In this case, however, ACMC and ACH are entirely unrelated aside from the sale of intangible CON rights. The two providers have no physical equipment, personnel, management, or financial support in common. The *Paragon* court's analysis of the benefits of "shifting" SNF services around therefore carries little weight in this case. *See South Shore Hosp. v. Thompson*, Civil Action No. 99–11611–JLT, 2002 WL 69487, at *4 (D.Mass. Jan.3, 2002) (noting that the purchasing and selling institutions at issue were related solely by the transfer of operational rights and distinguishing *Paragon* on that basis).

Finally, the Secretary now argues, relying again on *Paragon*, that it is reasonable to deny the exemption to providers in ACMC's position because they receive economic benefits in the form of decreased competition from CON programs, and that these benefits help to offset additional startup costs. *See Paragon*, 251 F.3d at 1150. The Secretary suggests that it is therefore reasonable to conclude that the benefits created by a CON program in the form of decreased competition balance out any startup costs a provider like ACMC might incur, thus eliminating the policy basis for providing an exemption. This argument was not considered by the Board, however, and does not appear to have been advanced at all below. That it has been raised only in the Secretary's reply brief and is not supported by the record is reason enough to reject it. Even if the argument had been properly brought before this Court, however, the Court would reject it. First, there is no indication that the Secretary has considered the actual effects of decreased competition on offsetting startup costs. The Secretary instead relies on the "commonsense proposition" that businesses are financially benefitted by being protected from competition. Def. Reply at 13. This may not be a safe assumption when considering providers in ACMC's position, however. First of all, Ohio has placed a moratorium on SNF beds, not on SNFs. The moratorium will naturally have some slight effect on the number of SNFs operating in the state, but ACMC itself is proof that the moratorium does not stifle competition. ACH alone could potentially give rise to 20 competitors if it chose to sell off all of its beds in the manner it sold the 15 beds at issue in this case to ACMC. Each of these competitors could be expected to face not only low occupancy rates and high startup costs during the first three years of operation, but also *increased* competition in the SNF market. Furthermore, providers hoping to open facilities in moratorium states are significantly worse off than those in other states—whether nonmoratorium CON states or nonCON states-since the right to operate SNF beds in states like Ohio is limited, and providers like ACMC must

pay a premium above and beyond normal startup costs to obtain that right. Only the fuzziest of math could support the Secretary's assumption that providers in moratorium states are less in need of the exemption to set off startup costs and the costs of low occupancy rates within the first three years of operation than their counterparts in nonmoratorium states. The Court therefore concludes that the Secretary's deviation from Medicare's well-established uniform reimbursement norm in this case is based on an arbitrary and capricious interpretation of the new provider exemption.

For these reasons, the Court finds that, even if the language of the regulation were ambiguous, the Secretary's interpretation would be arbitrary, capricious, and clearly erroneous. ACMC and other providers in moratorium states that purchase CON rights from unrelated providers fit comfortably within the language and purpose of the new provider exemption. The Secretary has advanced no reasonable argument to support a distinction between these providers and other "new providers" deserving of a subsidy to offset high start-up costs in the first three years of operation. If, after more careful evaluation, the arguments advanced by the Secretary here prove to be valuable, amendments to the regulations or statutes may be appropriate. It would be inappropriate, however, for this Court to allow the Secretary to bypass these amendment procedures by arbitrarily and capriciously interpreting the existing regulation on an ad hoc basis. Were the Secretary to propose new rules and regulations, ACMC and the many providers like it that fit well within the terms and purposes of the new provider exemption would undoubtedly have much to add to any debate during the notice and comment period. *See Maximum Home Health Care,* 272 F.3d at 321–22 (holding that an interpretation of a regulation by the Secretary that created a new burden on a provider was arbitrary and capricious where it could and should have been submitted to appropriate notice and comment rulemaking procedures (citing *Ohio Dep't of Human Servs. v. U.S. Dep't of Health & Human Servs.,* 862 F.2d 1228, 1233–37 (6th Cir.1988))); *see also Shalala v. St. Paul–Ramsey Med. Ctr.,* 50 F.3d 522, 529 (8th Cir.1995) (" '[W]e are not at liberty to allow the agency to imply language that does not exist in the regulation.' " (quoting *Beazer East, Inc. v. U.S. Envtl. Prot. Agency,* 963 F.2d 603, 607 (3d Cir.1992))).

## CONCLUSION

For these reasons, the Court grants ACMC's motion for summary judgment and denies the Secretary's motion for summary judgment. This case is remanded to the Provider Reimbursement Review Board for a determination of the reimbursements owed to ACMC consistent with this opinion. The Court also notes that it retains jurisdiction to consider ACMC's request for legal fees and costs upon an appropriate motion with supporting affidavits.

This order is final and appealable.

IT IS SO ORDERED.

## *ORDER*

The Court has filed its memorandum and order granting plaintiff's and denying defendant's motions for summary judgment; remanding to the Provider Reimbursement Board for a determination; and retaining jurisdiction to consider plaintiff's request for legal fees and costs. Therefore,

IT IS ORDERED that plaintiff's motion for summary judgment (Doc. # 8) is granted; and defendant's motion for summary judgment (Doc. # 11) is denied. The Clerk of Court is directed to remand this case to the Provider Reimbursement Re-

view Board for a determination of the reimbursements owed to plaintiff. Further, the Court retains jurisdiction to consider plaintiff's request for legal fees and costs upon an appropriate motion with supporting affidavits. Final judgment is entered in favor of the plaintiff; and the case is dismissed.

IT IS FURTHER ORDERED that this judgment is final and appealable.