*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0452P (6th Cir.)
File Name: 03a0452p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ASHTABULA COUNTY
MEDICAL CENTER,
    *Plaintiff-Appellee/*
    *Cross-Appellant,*

    *v.*

TOMMY G. THOMPSON,
Secretary of Health and
Human Services,
    *Defendant-Appellant/*
    *Cross-Appellee.*

Nos. 02-3410/3425

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 00-01895—Ann Aldrich, District Judge.

Argued: September 18, 2003

Decided and Filed: December 19, 2003

Before: BOGGS, Chief Judge; NORRIS and CLAY,
Circuit Judges.

---

---

## COUNSEL

**ARGUED:** Anthony A. Yang, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. David M. Levine, BENESCH, FRIEDLANDER, COPLAN & ARONOFF, Cleveland, Ohio, for Appellee. **ON BRIEF:** Anthony A. Yang, Barbara C. Biddle, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. David M. Levine, BENESCH, FRIEDLANDER, COPLAN & ARONOFF, Cleveland, Ohio, Mark D. Tucker, BENESCH, FRIEDLANDER, COPLAN & ARONOFF, Columbus, Ohio, for Appellee.

---

## OPINION

---

ALAN E. NORRIS, Circuit Judge. Plaintiff Ashtabula County Medical Center ("ACMC"), a hospital located in Ashtabula, Ohio, sought a higher rate of reimbursement for the care provided in its skilled nursing facility ("SNF") than that allowed by the United States Department of Health and Human Services ("HHS"). ACMC filed suit in federal court seeking review of a final decision of the Provider Reimbursement Review Board ("the Board"), which had construed the applicable statutes and regulations in a manner adverse to the hospital. The district court held that the Secretary's interpretation of the governing statute and regulations was unreasonable and granted summary judgment to ACMC. *Ashtabula County Med. Ctr. v. Thompson*, 191 F. Supp. 2d 884 (N.D. Ohio 2002). The Secretary appeals from that order and ACMC cross-appeals from the district court's failure to explicitly rule upon its motion for costs and interest.

## I.

This case presents us with a question of statutory construction viewed through the lens of the Administrative Procedure Act ("APA"), which cautions that agency decisions may only be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or are "unsupported by substantial evidence . . . or otherwise reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(A), (E).

Because the parties do not contest the facts underlying this dispute, we will rely upon the district court's factual recitation to set the stage:

. . . Both parties stipulated to the relevant facts in a hearing before the Board, and the Court agrees with the parties that there is no dispute as to any material factual issues. ACMC is a hospital located in Ashtabula, Ohio. In May, 1995, ACMC entered into an "Agreement for Purchase of the Right to Operate Nursing Home Beds" with the County Commissioners of Ashtabula County, the owners of the Ashtabula County Home ("ACH"), under which ACMC acquired the right, title, and interest to fifteen of ACH's 310 beds at a price of $7500 per bed. ACMC and ACH are separate and unrelated health care institutions, and ACMC acquired no other assets from ACH. Under Ohio law, which has imposed a moratorium on nursing facility beds in the state of Ohio, ACMC was required to purchase existing beds from another provider and apply for a certificate of need ("CON") before commencing operations. It applied in June 1995 for a CON granting it authority to acquire, relocate, and place into service fifteen long-term care beds on its premises, and the application was granted in October 1995. ACMC, which had not operated as a nursing facility or a skilled nursing facility ("SNF") previously, became Medicare-certified on March 27,

1996. When ACMC began operating its SNF, no ACH personnel became ACMC employees or managers. ACH continued to operate as a distinct entity, without any change in its licensure or certification. Furthermore, no ACH residents were transferred to ACMC when ACMC began operating the SNF. Rather, all of the admissions and residents of ACMC's distinct part SNF during the first six months of operation had home addresses within Health Service Area ("HSA") # 10, one of the ten regions into which Ohio is divided for the purposes of administering the CON program. Both ACH and ACMC are located within HSA # 10, about seven miles from one another.

In July 1996, ACMC submitted a request for an exemption under the new provider provision from the routine cost limits ("RCLs") applicable under the Medicare statutes. The new provider provision is an exemption from the statutory caps placed on Medicare reimbursement for health care providers, who, under the Medicare program, are generally reimbursed up to the statutory limit for their reasonable costs in providing necessary health care services. On July 25, 1996, the Health Care Financing Administration ("HCFA") [since renamed "The Centers for Medicare and Medicaid Services"] denied the request. ACMC appealed to the PRRB [the Board], which affirmed HCFA's decision. The Board's opinion became the final decision of the Secretary pursuant to 42 U.S.C. § 1395oo(f)(1). ACMC now seeks judicial review of the PRRB's determination that ACMC does not qualify for a new provider exemption to the RCLs.

191 F. Supp. 2d at 886-87 (footnotes omitted).

The Social Security Act, which established the Medicare program, provides payment to qualified hospitals and SNFs (nursing homes) in return for the services that they provide to

older and disabled citizens. For the relevant period, the Medicare program restricted payments to SNFs to an amount equal to the lesser of the "reasonable cost" of or the customary charge for its services:

> The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services . . . .

42 U.S.C. § 1395x(v)(1)(A). This "reasonable cost" restriction applies to "routine service costs," which include things like a room, board, and nursing care. Whenever a SNF's routine service costs go over per diem cost limitations, they are deemed unreasonable. The manner in which the applicable routine service cost limits, referred to as "RCLs," are calculated has been adequately summarized elsewhere by this court. *See St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 940-41 (6th Cir. 2000).

As the passage quoted from the district court's opinion makes clear, the central issue in this appeal is an exception to the RCL restrictions, known as "the new provider exemption." As the Provider Reimbursement Manual ("PRM")[1] explains, "42 C.F.R. § 413.30(e) provides for an exemption from the SNF routine service cost limits for new providers. This provision was implemented to recognize the difficulties in meeting the applicable cost limits due to underutilization during the initial years of providing skilled nursing and/or rehabilitative services[.]" HCFA Pub. 15-1

---

[1]The PRM contains the interpretive rules regarding Medicare reimbursement.

§ 2533.1, at 25-12.1C2 (1997). The disputed regulation, which has since been amended, defined a "new provider" in these terms:

> A new provider is a provider of inpatient services that has operated as the type of provider (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than three full years. An exemption granted under this paragraph expires at the end of the provider's first cost reporting period beginning at least two years after the provider accepts its first patient.

42 C.F.R. § 413.30(e) (1995). The PRM provides the following gloss on this exemption:

> Although a complete change in the operation of the institution . . . shall affect whether and how long a provider shall be considered a "new provider," changes of the institution's ownership or geographic location do not in itself alter the type of health care furnished and shall not be considered in the determination of the length of operation.

> However, for purposes of this provision, a provider which relocates may be granted new provider status where the normal inpatient population can no longer be expected to be served at the new location. . . .

HCFA Pub. 15-1 § 2604.1, at 26-4 (1984).

As already mentioned, ACMC purchased the right to operate fifteen nursing home beds from ACH in 1995. For its part, ACH had provided skilled nursing care since 1989. ACMC paid $112,500 to acquire the beds from ACH, which it then relocated to its hospital complex. In the process, it obtained a CON from the State of Ohio, as well as Medicare certification.

ACMC sought the new provider exemption described above for its facility. After the HCFA determined that the SNF did not qualify as a new provider, the hospital appealed to the Board, which affirmed the denial in a decision rendered on June 29, 2000. In its decision, the Board relied upon the factual stipulations recited by the district court. The Board based its denial on the theory that a change of ownership had occurred with respect to the fifteen long term care beds and, because ACH had operated those beds as part of a participating nursing facility under the Medicare and Medicaid programs since 1989, ACMC could not be deemed a new provider.

ACMC appealed to the district court pursuant to 42 U.S.C. § 1395oo(f). Both parties filed motions for summary judgment. The district court reversed the Board and granted judgment to ACMC. After substantial preliminary discussion, the district court attempted to determine whether the term "provider" as used in the regulation at issue was ambiguous.[2] The district court viewed the following as the crucial question: By purchasing ACH's CON rights to the fifteen beds, did ACMC simply take over ownership of an existing provider and thereby undermine its entitlement to "new" provider status, or did ACMC's establishment of a SNF in a new location, with new personnel, and new patients constitute the kind of break in operations that entitled it to the exemption?

The district court first determined that the term "provider" as used in the regulation was unambiguous and that the Secretary had erred in applying it:

---

[2]As a reminder, the new provider exemption reads, "A new provider is a provider of inpatient services that has operated as the type of provider (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than three full years." 42 C.F.R. § 413.30(e) (1995).

. . . The Court . . . concludes that the term "provider" is unambiguous and must refer to an institution (or distinct part of an institution), not merely to a characteristic or attribute of such an institution. Furthermore, the statutory definitions and the PRM interpretation effective during the relevant period indicate that Congress and the Secretary intended the term provider to refer to an institution or distinct part thereof and that the Secretary's new twist on that definition is contrary to "other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. Hosp.* [*v. Shalala*], 512 U.S. [504,] 512, 114 S.Ct. 2381.

Applying the plain meaning of the regulation, the term provider refers to the institution applying for the exemption – ACMC's new distinct part SNF – not merely to its intangible characteristics or attributes – the CON rights purchased from ACH, which allowed it to come into existence. Because ACMC's distinct part SNF did not exist until ACMC purchased the CON rights from ACH, it qualified as a new provider under the provisions of the new provider exemption regulation. The Board's decision was therefore contrary to the plain meaning of the regulation.

191 F. Supp. 2d at 893.

In the alternative, the district court assumed *arguendo* that the term "provider" was ambiguous. If so, then the Secretary's position must be affirmed unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A) (APA). The district court concluded that the Secretary's interpretation was arbitrary and capricious. 191 F. Supp. 2d at 893-97. Because we agree with the district court that the term was unambiguous, we need not reach its alternative holding.

After entry of judgment, ACMC filed a motion for costs and an award of interest pursuant to 42 U.S.C. § 1395oo(f)(2). The Secretary responded by moving for a stay. He conceded that the statute provided for the taxing of costs but urged the court "in the interest of judicial economy" to postpone its ruling on the matter until "any appeal of the judgment . . . has been finally resolved." The district court granted the stay without explicitly ruling on the motion for costs and interest.

**II.**

Deference to the Secretary's interpretation of the regulation only comes into play if its plain language is ambiguous. Recognizing this fact, the Secretary explains why, in his view, ambiguity calling for interpretation (and deference) exists. Pointing to *Paragon Health Network, Inc. v. Thompson*, 251 F.3d 1141 (7th Cir. 2001), he contends that the term "provider" is ambiguous.

*Paragon* is one of several cases bearing a remarkable similarity with the one now before us. Paragon Health Network obtained 35 nursing home beds for a new SNF from Shores Transitional Care and Rehabilitation Center via Wisconsin's CON process. As in the instant case, the two facilities were located in the same health care service area and the only asset transferred between the two facilities "were the CON rights; no residents, staff, or equipment were transferred." *Id.* at 1144. With respect to the ambiguity question, the Seventh Circuit reasoned as follows:

. . . Paragon argues that the regulation has a plain meaning, which is contradicted by the Secretary's interpretation. Paragon focuses on the phrase "provider of inpatient services that has operated" in the regulation and its relation to "present and previous ownership." According to the appellant, the question of ownership must be decided with respect to the "provider" as a whole. A "provider" consists of all those attributes

necessary for a SNF to "operate[ ]" – that is, not just CON rights, but physical beds, employees, administrators, equipment, patients, referral sources, etc. Paragon backs this up with a citation to PRM § 2604.1, which states that a "new provider is an institution that has operated. . . ." Paragon claims that the use of the word "institution" in the PRM underscores the fact that "provider" in 42 C.F.R. § 413.30(e) refers to the facility as a whole, rather than just CON rights. Thus, only when the SNF as an entire operating institution is transferred to a new owner can the exemption for a new provider be denied.

. . . [W]e conclude that the regulation is ambiguous on what constitutes a "provider." Paragon is correct that a nursing "provider" is composed of many different attributes, but changing one or more of these characteristics does not mean that the SNF becomes a different "provider." For example, if a facility fires all its staff and hires a new one, but makes no other changes, an ordinary user of the English language probably would consider the SNF with the new staff to be the same "provider" as it was before. Similarly, a SNF that replaced all of its old equipment with new models would still be the same "provider" as it was before the modernization. Even if a SNF both fired its staff and replaced all of its equipment, one might still call it the same "provider" if the administration and physical plant remained the same. Of course, if all the various things that make up a SNF were new in the sense that they had not been part of another facility, then one would have to call that SNF a "new provider." Conversely, if a nursing facility did not change any of its aspects, it would unquestionably continue to be the same provider rather than a new one. The difficulty in drawing a line between these two extremes is what makes the word "provider" ambiguous as used in the regulation.

*Id.* at 1148.  The district court considered, and rejected, this analysis:

> This Court respectfully disagrees with the Seventh Circuit's analysis.  That analysis appears to conflate the questions whether the term "new provider" is ambiguous and whether the term "provider" as used in the phrase "provider of inpatient services" is ambiguous.  The Seventh Circuit's reasoning actually focuses on the difficulty of drawing the line between the "same 'provider'" and a "new provider."  This inquiry relates more to the ambiguity of the term "new" than the ambiguity of the term "provider."  The regulation is entirely unambiguous about the meaning of the term "new," however.  Under the plain terms of the regulation, a "new" provider is one that has existed "under present and previous ownership, for less than three full years."  The inquiry should focus instead on the meaning of the term "provider," which this Court finds to be unambiguous.  Relevant definitions elsewhere in the statute and PRM as well as ordinary English usage lead this Court to conclude that the term provider can only be understood to refer to an institution or distinct part of an institution, not to a mere characteristic or attribute of such an institution.  The relevant inquiry is simply whether a second, new institution has come into existence as a result of the transaction.

*Ashtabula County Medical Ctr.*, 191 F. Supp. 2d at 892-93 (footnote omitted).

Although the term "provider" is not defined in § 413.30(e), its meaning is made clear by referencing related statutes: the term "provider of services" includes a "skilled nursing facility," 42 U.S.C. § 1395x(u); "skilled nursing facility," in turn, is "an institution (or a distinct part of an institution)," that is primarily engaged in providing skilled nursing care to its residents, 42 U.S.C. § 1395i-3(a).  Given these definitions,

the term "provider" as used in 42 C.F.R. § 413.30(e) refers to a Medicare-certified institution (or Medicare-certified distinct part) that furnishes specified services (here, SNF services).  In this case, ACMC represents the "provider of inpatient services" contemplated by § 413.30(e).

The Fourth Circuit has likewise concluded that § 413.30(e) is not ambiguous, and explicitly rejected the reasoning of *Paragon*.  *Maryland Gen. Hosp., Inc. v. Thompson*, 308 F.3d 340 (4th Cir. 2002).  In that case, the court confronted a factual scenario similar to the one before us: Maryland General Hospital had purchased nursing home beds from an unrelated entity and established a "distinct part" SNF within its hospital facility.  The Board, which was upheld by the district court, denied "new provider" status for the reasons urged by the Secretary in the instant case.  The Fourth Circuit reversed and concluded that the regulation was unambiguous and supported a conclusion "that 'provider' as used in section 413.30(e) unambiguously refers to the business institution providing the skilled nursing services.  It therefore follows that the regulation permits consideration of the institution's past and current ownership, but not the past and current ownership of a particular asset [i.e., beds] of that institution." *Id.* at 347.  The court provided the following reasoning in reaching its judgment:

> . . . Section 413.30(e) does not define "provider," but the structure and wording of the regulation suggest that the provider is the business entity or institution providing the skilled nursing services. This reading is consistent with the meaning attached to a similar term in another part of the Medicare Act. *See* 42 U.S.C.A. § 1395x(u) (defining "provider of services" as "a hospital, critical access hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, [or] hospice program").  This business-entity-specific reading of the regulation is also supported by the explanation of the "new provider" exemption contained

in the version of Medicare's "Provider Reimbursement Manual" . . . in effect at the time MGH purchased the beds . . . . These repeated references to an "institution" indicate that application of the new provider exemption depends upon the ownership and operation of the business entity that is providing the skilled nursing services. There is no dispute that neither MGH nor any previous owner of MGH had provided inpatient skilled nursing services before the Transitional Care Center was established. Thus, it would appear that MGH meets the requirements for a "new provider" as set forth in 42 C.F.R. § 413.30(e).

*Id.* at 343-44. After distinguishing *Paragon*, the court suggests the following analysis:

Notwithstanding the absence of a definition of "provider," we simply cannot conclude that section 413.30(e) is ambiguous. Given the ordinary meaning of the word "provider" and the manner in which it is used in the regulation, section 413.30(e) can only be understood as focusing on the business institution that is providing the skilled nursing services. If that institution, whether under its current or prior ownership, has operated as a skilled nursing facility for more than three years, then it is not entitled to the new provider exemption. If that institution under current or prior ownership has *not* previously operated as a skilled nursing facility, then it is entitled to the new provider exemption, even if the institution has purchased some of its assets from skilled nursing facilities that have operated for more than three years.

*Id.* at 346 (emphasis in original).[3]

The fact that a circuit split exists on this question indicates that it is a very close call and, in one sense, supports the Secretary's contention that the regulation is ambiguous. However, we conclude that the language of section 413.30(e) has a plain meaning. As the Fourth Circuit held, a "provider" is nothing more than a "business institution that is providing . . . skilled nursing services." *Maryland General*, 308 F.3d at 346. Everything about ACMC's facility is new except for the CON rights. It is housed in a new building and has new patients, a new staff, and a new corporate identity. The kind of corporate shenanigans feared by the Secretary did not occur here. Rather, ACMC set up a SNF in its hospital. In order to do so, it purchased a single asset from ACH in the form of a CON for fifteen nursing home beds, just as if it had bought a used x-ray machine or kitchen oven. Such a purchase does not make ACMC into ACH repackaged. Accordingly, we hold that ACMC is entitled to "new provider" status pursuant to section 413.30(e).

### III.

Having affirmed the judgment of the district court, we turn to ACMC's motion for costs and interest filed pursuant to 42 U.S.C. § 1395oo(f). The costs sought are negligible: $399.10; interest, which is yet to be determined, will presumably be more significant. As mentioned earlier, the district court did not explicitly rule on this matter when it granted a stay.

---

[3]Shortly after the Fourth Circuit reached its conclusion, the First Circuit came out precisely the other way. *South Shore Hosp., Inc. v. Thompson*, 308 F.3d 91 (1st Cir. 2002) (citing *Paragon* with approval).

While it appears that ACMC is entitled to costs and interest, we shall remand the matter to permit the district court to make that determination in the first instance.

## IV.

The judgment of the district court is **affirmed** and the cause **remanded** for further proceedings consistent with this opinion.