In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3707

Paragon Health Network, Inc., d/b/a Milwaukee
Subacute Center, a/k/a Milwaukee Subacute and
Rehabilitation Center,

Plaintiff-Appellant,

v.

Tommy G. Thompson,/* Secretary, Department
of Health and Human Services,

Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 98-C-0553--Rudolph T. Randa, Judge.

Argued April 12, 2001--Decided June 5, 2001


   Before Flaum, Chief Judge, and Manion and
Kanne, Circuit Judges.

 Flaum, Chief Judge.  Plaintiff Paragon
Health Network, Inc. ("Paragon")/1
appeals from a district court decision
affirming a determination that its newly
opened skilled nursing facility ("SNF"),
Milwaukee Subacute Center ("MSC"), is not
eligible for an exemption from the
routine cost limits ("RCLs") of Medicare.
Paragon contends that the interpretations
by the Secretary of Health and Human
Services ("Secretary") of the relevant
regulation are arbitrary and unreasonable
and that the decision denying an
exemption to MSC is not supported by
substantial evidence. For the reasons
stated herein, we affirm.

I.  Background

   Wisconsin has adopted a set of statutes
regulating nursing facilities. Wis. Stat.
sec. 150.21, et seq. Wisconsin requires
each SNF to have Certificate of Need
("CON") rights for the beds it operates.
The state has a moratorium on the
issuance of new CON rights; thus, to open
a SNF, one must obtain CON rights from a
currently existing nursing provider.
Wisconsin permits the transfer of CON

rights, but only to a related entity that will operate within the same Health Service Area ("HSA") as the current owner of the rights. The state is split into eight HSAs.

Paragon opened MSC as a SNF in downtown Milwaukee, Wisconsin on April 7, 1995, with a capacity of thirty-five nursing beds. MSC obtained the rights to these thirty-five beds from Shores Transitional Care and Rehabilitation Center ("Shores"), another facility owned by Paragon. Shores is located in Glendale, a northern suburb of Milwaukee, and the distance between the two facilities is about seven miles. Both MSC and Shores are located in HSA Number Two, which is approximately eighty miles long, forty to fifty miles wide, and encompasses the city of Milwaukee and seven counties. At the time immediately before the transfer, Shores had CON rights to four-hundred-and-three beds. Shores continues to operate as a separate facility after the transfer of a fraction of its CON rights to MSC. The only thing that MSC received from Shores were the CON rights; no residents, staff, or equipment were transferred.

The RCLs are the maximum amount that the federal government will pay for services under the Medicare program. See generally Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 404-06 (1993) (providing a "rough description" of the RCL regime). At the time when MSC opened, 42 C.F.R. sec. 413.30(e) exempted "new providers" from the RCLs for a period of up to two years. MSC applied for this exemption on June 20, 1995, but the Health Care Financing Administration ("HCFA"), the federal agency through which the Secretary administers the Medicare program, denied this request. Paragon appealed to the Provider Reimbursement Review Board ("PRRB"), which conducted an evidentiary hearing and concluded that MSC was not entitled to the new provider exemption. The PRRB found that MSC was a relocated portion of Shores rather than a new facility, relying only on the transfer of CON rights from Shores to MSC in reaching this conclusion. The PRRB also considered whether MSC would be granted the new provider exemption as a relocated provider serving a substantially different inpatient population. The PRRB stated that MSC could not qualify for the

exemption in this manner either because MSC's patients came from the same cities and towns as Shores, which is to say that almost all of the patients of both facilities live in Milwaukee. The HCFA Administrator declined to review the adjudication, and so the PRRB's decision became the final decision of the Secretary. 42 U.S.C. sec. 1395oo(f)(1). Paragon filed suit in district court claiming that the PRRB's decision unreasonably interpreted 42 C.F.R. sec. 413.30(e) and was not supported by substantial evidence, but the court rejected Paragon's arguments and entered summary judgment in favor of the Secretary.

II. Discussion

A. Standard of Review

42 U.S.C. sec. 1395oo(f)(1) states that we review the Secretary's decision under the Administrative Procedure Act. Thus, we will reverse the Secretary's determination only if it is arbitrary, capricious, not supported by substantial evidence, or otherwise deficient under the standards set forth in 5 U.S.C. sec. 706. In addition, we normally defer to the Secretary's reasonable construction of the Medicare regulations. See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). We first consider whether the regulation is ambiguous. See Christensen v. Harris County, 529 U.S. 576, 588 (2000). If not, then we apply the regulation according to its plain meaning; if so, then the Secretary's interpretation is entitled to "controlling weight unless it is plainly erroneous or inconsistent with the regulation." Thomas Jefferson, 512 U.S. at 512 (internal quotation marks omitted); see also Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945).

B. Secretary's Interpretation

42 C.F.R. sec. 413.30(e) contains an exemption to the Medicare RCLs for a "new provider." A new provider is defined as "a provider of inpatient services that has operated as the type of provider (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than three full years."/2 The Provider Reimbursement

Manual ("PRM"), a set of instructions issued by the Secretary that constitutes an administrative interpretation of the Medicare statute and regulations, see Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 101-02 (1995) (referring to PRM provisions as interpretive rules), provides further guidance on new provider exemptions. PRM sec. 2604.1 reiterates the definition of new provider contained in the regulation, and then states that a provider which relocates could be granted new provider status if it meets certain conditions./3

In denying that MSC was a new provider, the PRRB relied solely on the fact that MSC had acquired CON rights from Shores. In determining the length of time a provider has "operated," the Secretary considers the "previous ownership" of the SNF's CON rights. The operating history of the SNF from which any CON rights were obtained is imputed to the acquiring provider. In the instant case, this interpretation caused the PRRB to conclude that MSC had been operating since 1979, the year Shores opened, since MSC and Shores provide the same type of service. Instead of MSC being a new provider, the PRRB decided that MSC was a relocated part of Shores.

C. New Provider

1. Challenges to Seminole Rock deference.

Paragon has a number of arguments as to why the Secretary's interpretation is incorrect, but the contentions we will initially consider regard the weight that should be given to the Secretary's construction of 42 C.F.R. sec. 413.30(e). Paragon claims that the deference normally accorded agency interpretations of their own regulations is warranted only where the interpretation is both contemporaneous with the regulation and consistently applied. Appellant claims that the contemporaneity requirement for deference is not satisfied here because the Secretary's interpretation relying solely on the transfer of CON rights to deny that a SNF is a new provider was not made until 1995, while the regulation was promulgated in 1979. Paragon also contends that the interpretation has not been consistent, relying on PRM sec. 2154.2.C., which defines "relocate" as

"[t]o move an existing provider to a new location and close the old provider." Paragon claims that this is the only definition of "relocate" in the PRM, and so should be applied whenever that word appears in the Medicare statute, regulations, or PRM provisions. Paragon seizes upon the last part of this definition to argue that MSC cannot be a relocated provider since the old provider, Shores, has not closed. Thus, the PRRB was inconsistent in labeling MSC as a relocated provider since this decision ignored the definition of "relocate" contained in the PRM.

The Secretary claims that the current interpretation of 42 C.F.R. sec. 413.30(e) is not new, but does not cite any decision construing that regulation in the manner at issue here until 1995. The Secretary also cites a number of post-1995 PRRB decisions that have consistently applied the proffered interpretation. Appellee claims that the definition of "relocate" contained in PRM sec. 2154.2.C. has never been applied to new provider exemptions and concerns a completely different subject. HCFA has long recognized the concept of a partial relocation in applying new provider exemptions from the RCLs.

Before we address the legal issues, we set forth the history of the interpretation of 42 C.F.R. sec. 413.30(e) as best we can determine from the submissions of both parties. That regulation has been given the same consistent interpretation since 1995, but neither party has provided evidence of any construction prior to that time. Thus, we assume that the regulation was first authoritatively construed in 1995. We also accept that the definition of "relocate" contained in PRM sec. 2154.2.C. has not been applied to the regulations concerning exemptions and the concept of a partial relocation has been recognized by HCFA.

We first conclude that the apparent lack of contemporaneity between the promulgation of the regulation and the Secretary's interpretation of it does not affect the high level of deference we owe to the Secretary. In the context of judicial deference to agency interpretations of administrative statutes under Chevron, U.S.A., Inc. v.

Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), an agency construction formulated well after the statute's enactment is still entitled to deference. See Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 740-41 (1995). Smiley explained that the rationale of Chevron is a presumption that Congress intended for ambiguities in a statute primarily to be resolved by the agency charged with administering that statute, and so deference is warranted regardless of whether the agency officials interpreting the law have any special knowledge of Congress's specific intentions at the time the statute was passed. Id. The rationale for Seminole Rock deference is similar to that for Chevron. Martin v. Occupational Safety & Health Review Commission, 499 U.S. 144, 151 (1991) explains that regulatory deference is justified by the presumption that the power to authoritatively interpret the agency's own regulations is part of the lawmaking powers delegated by Congress. Thus, just as with Chevron, deference to regulatory interpretations does not depend on contemporaneity, since no demonstration that the agency officials had special insight into the intentions behind the passage of the regulation is required. Instead, Congress is presumed to have delegated the primary power to fill regulatory ambiguities to the agency, and courts owe deference to agency decisions that clarify a regulation regardless of the fact that the agency waited to exercise this power.

Moving on to the consistency question, we initially note that Paragon is not arguing that the Secretary has in the past used the PRM sec. 2154.2.C. definition of "relocate" in new provider determinations under 42 C.F.R. sec. 413.30(e) and PRM sec. 2604.1, but now refuses to do so. A HCFA witness at the PRRB hearing stated that HCFA had always recognized the concept of partial relocations, where the original provider does not close its doors, and Paragon has not brought forth any evidence to contest that assertion. Rather, Paragon contends that HCFA and the PRRB should have used the PRM sec. 2154.2.C. in making new provider determinations, contrary to the actual practice. Paragon relies on the canon that "identical words used in different parts of the same act are intended to have the same meaning,"

Commissioner v. Keystone Consol. Indus., Inc., 508 U.S. 152, 159 (1993) (internal quotation marks omitted), to argue that the definition in PRM sec. 2154.2.C. should be applied to new provider determinations under PRM sec. 2604.1.

The PRM, while a useful guide to interpreting the Medicare statute and regulations, is not strictly binding on the Secretary; we will uphold a decision despite certain variations from the manual. See Howard Young Med. Ctr. Inc. v. Shalala, 207 F.3d 437, 442-43 (7th Cir. 2000); Adventist Living Ctrs., Inc. v. Bowen, 881 F.2d 1417, 1423-24 & n.10 (7th Cir. 1989). Thus, Paragon's argument that the Secretary is required to use the PRM definition has less weight than if that definition appeared in the Medicare statutes or regulations. Moreover, the canon Paragon relies on has reduced force when the identical word is used in different provisions which address disparate subjects. See Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433 (1932); see also United States v. Cleveland Indians Baseball Co., 121 S. Ct. 1433, 1441 (2001). PRM sec. 2154.2.C. is contained in a section of the PRM discussing when planning costs will be incorporated into the historical cost of a facility, while the issue in this case is exemptions from the RCLs for new providers, which is discussed in a wholly different chapter of the PRM. As noted above, the Secretary has consistently labeled a transfer of less than an entire facility as a partial relocation for purposes of the new provider exemption. Given all of these circumstances, we find nothing untoward in the Secretary's declining to rely on the definition of "relocate" in PRM sec. 2154.2.C. in making new provider determinations under 42 C.F.R. sec. 413.30(e) and PRM sec. 2604.1. Thus, we conclude that Seminole Rock deference is owed to the Secretary's interpretation of 42 C.F.R. sec. 413.30(e) despite the lack of contemporaneity and refusal to apply PRM sec. 2154.2.C./4

2. Ambiguity.

Having found that Seminole Rock deference is warranted, we next determine whether 42 C.F.R. sec. 413.30(e) is ambiguous. Paragon argues that the

regulation has a plain meaning, which is contradicted by the Secretary's interpretation. Paragon focuses on the phrase "provider of inpatient services that has operated" in the regulation and its relation to "present and previous ownership." According to the appellant, the question of ownership must be decided with respect to the "provider" as a whole. A "provider" consists of all those attributes necessary for a SNF to "operate[ ]"-- that is, not just CON rights, but physical beds, employees, administrators, equipment, patients, referral sources, etc. Paragon backs this up with a citation to PRM sec. 2604.1, which states that a "new provider is an institution that has operated . . . ." Paragon claims that the use of the word "institution" in the PRM underscores the fact that "provider" in 42 C.F.R. sec. 413.30(e) refers to the facility as a whole, rather than just CON rights. Thus, only when the SNF as an entire operating institution is transferred to a new owner can the exemption for a new provider be denied.

Despite Paragon's arguments, we conclude that the regulation is ambiguous on what constitutes a "provider." Paragon is correct that a nursing "provider" is composed of many different attributes, but changing one or more of these characteristics does not mean that the SNF becomes a different "provider." For example, if a facility fires all its staff and hires a new one, but makes no other changes, an ordinary user of the English language probably would consider the SNF with the new staff to be the same "provider" as it was before. Similarly, a SNF that replaced all of its old equipment with new models would still be the same "provider" as it was before the modernization. Even if a SNF both fired its staff and replaced all of its equipment, one might still call it the same "provider" if the administration and physical plant remained the same. Of course, if all the various things that make up a SNF were new in the sense that they had not been part of another facility, then one would have to call that SNF a "new provider." Conversely, if a nursing facility did not change any of its aspects, it would unquestionably continue to be the same provider rather than a new one. The difficulty in drawing a line between these two extremes is what

makes the word "provider" ambiguous as used in the regulation.


3.  Reasonableness.

Since the regulation is ambiguous, we next examine whether the Secretary's interpretation is plainly erroneous or inconsistent with the text. We begin with what is basically an extension of Paragon's argument for the clarity of the regulation's language. Even if words like "provider" and "operate[ ]" are ambiguous, these must refer to more than just a provider's CON rights. In determining whether a SNF operated "under . . . previous ownership," the Secretary should not rely on CON rights alone but also take account of whether the staff, referrals, equipment, etc. of the facility are the same as the one from which the CON rights were obtained.

Paragon's argument does have a degree of merit--terms like "operate[ ]" and "provider" suggest that one should look to whether a group of attributes making up the institution have changed such that the SNF may be described as new, rather than just focusing on a single characteristic, such as CON rights. Nevertheless, we conclude that the Secretary's interpretation is not so much at variance with the language of the regulation as to be deemed plainly erroneous or inconsistent with the text. Medicare is a highly complex and technical program, and so deference to the Secretary's determinations in the course of administering the system is especially warranted. Thomas Jefferson, 512 U.S. at 512. Furthermore, an agency need not adopt the most natural reading of the regulation, but only a reasonable one. Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991). The Secretary explains that a transfer of CON rights does not result in the provision of any new services. Even though the transferee might have new equipment, staff, etc., it will provide the same kind of services as the transferor of the CON rights, just at a different location. We cannot say that the Secretary's interpretation that because no new services are being provided there is not a new provider is unreasonable.

Paragon also has a few policy arguments

as to why the Secretary's construction of 42 C.F.R. sec. 413.30(e) should be invalidated, but none of these are convincing. The first is that the purpose of the new provider exemption is "to allow a provider to recoup the higher costs normally resulting from low occupancy rates and start-up costs during the time it takes to build its patient population." San Diego Physicians & Surgeons Hosp. v. Aetna Life Ins. Co., [1990-1991 Transfer Binder] Medicare & Medicaid Guide (CCH) para. 39,007, at 25,061 (HCFA Administrator 1991). When MSC opened, it incurred large start-up costs and had a very low occupancy rate, resulting in high costs per patient. The receipt of CON rights from Shores did nothing to ameliorate these expenses. Thus, CON rights alone should not be used to deny that a SNF is a new provider since these rights have no relation to the purposes of the exemption.

However, the Secretary has an adequate response to this argument. At the time in question, SNFs were reimbursed under Medicare the lesser of the reasonable cost of or the customary charge for the service in question./5 42 U.S.C. sec. 1395f(b)(1) (1994). The definition of "reasonable cost" excludes any "cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. sec. 1395x(v) (1)(A). The Secretary contends, as with the textual argument above, that the transfer of CON rights simply shifts around SNF services. Creating a new facility and moving services to it, as Paragon did between MSC and Shores, is costly, but no benefit is gained in the overall delivery of health services if the new facility is providing the same services to the same populace as the old one. Thus, the Secretary's judgment that the high start-up costs of MSC were "unnecessary in the efficient delivery of needed health services" is a reasonable one that will not be disturbed by this court.

Paragon's next arguments focus upon the effect of making a new provider determination depend upon CON rights. The first is that several states do not have CON or similar programs, and that a HCFA witness at the PRRB hearing admitted that in such a state MSC would have been considered a new provider. To make a new provider determination depend solely on

which state the SNF happens to be in is unreasonable and arbitrary. The second is that under the Secretary's interpretation a new provider cannot exist in Wisconsin because the state has imposed a moratorium on issuing new CON rights. Any SNF that begins operations will have to obtain its CON rights from an already existing provider and have the transferor provider's history imputed to it, preventing it from being a new provider under 42 C.F.R. sec. 413.30(e).

We again find the Secretary's responses to these arguments to be sufficiently convincing so as to prevent us from declaring the interpretation to be plainly erroneous. Regarding the first, the Secretary points out that a CON program provides benefits for SNFs. More specifically, institutions like MSC are insulated from the effects of competition with new entrants. This fact reduces the need for new SNFs to obtain extra funds from Medicare in order to stay afloat. As for the second argument, the Secretary can rely in part on the state's determination that no new nursing facilities are needed to support a decision that additional beds are unnecessary to the efficient delivery of health care services in that state. Paragon complains that Wisconsin also ap proved the movement of beds from Shores to MSC, indicating that the state thought that the move was necessary to serve the area of inner-city Milwaukee. However, there is no evidence that Wisconsin's approval of the transfer of beds was made under the strict standard imposed by 42 U.S.C. sec. 1395x(v)(1)(A). Wisconsin might approve such relocations even though the cost is not necessary to the efficient delivery of health care. Thus, the Secretary could reasonably use Wisconsin's decisions about the state's need for nursing care to set an upper limit on the costs that are necessary for Medicare to bear, while denying reimbursement of costs in areas where the Secretary believes Wisconsin is too lenient.

To summarize, the lack of the contemporaneity between the regulation's promulgation and the adoption of the Secretary's current construction does not eliminate the deference we owe to the Secretary. Likewise, this deference is also not affected by the Secretary's

decision to use a definition of
"relocate" for the new provider exemption
other than the one stated in the PRM for
use on a different subject. The
regulation is ambiguous, and the
Secretary's interpretation of the
regulation is not plainly erroneous on
either textual or policy grounds.

D.  Relocated Provider

   The Secretary has interpreted the
exemption for new providers in 42 C.F.R.
sec. 413.30(e) to be available to certain
relocated providers. PRM sec. 2604.1
discusses when a relocated provider will
be granted the status of a new provider,
stating in part:

[F]or purposes of this provision, a
provider which relocates may be granted
new provider status where the normal
inpatient population can no longer be
expected to be served at the new
location. The distance moved from the old
location will be considered but will not
be the determining factor in granting new
provider status. For example, a specialty
hospital may move a considerable distance
and still care for generally the same
inpatient population, while the
relocation of a general hospital a
relatively short distance within a
metropolitan area may greatly affect the
inpatient population served. A provider
seeking such new provider status must
apply to the intermediary and demonstrate
that in the new location a substantially
different inpatient population is being
served.

MSC's request for new provider status
based on its relocation was denied by the
PRRB. In interpreting the phrase
"substantially different inpatient
population," the PRRB applies a "same
cities and towns" standard: if the
relocated provider's current patients
came from the same cities and towns as at
its old location, then the exemption will
be denied. The vast majority of patients
for both MSC, the relocated provider, and
Shores, the original location, come from
the city of Milwaukee, and thus the PRRB
denied the exemption.


   1.  Retroactivity.

   Paragon's first challenge is that the

PRRB's decision retroactively applied a new rule, violating Bowen v. Georgetown University Hospital, 488 U.S. 204 (1988). Paragon claims that current PRM sec. 2533.1.B.3, which did not come into effect until after MSC's application for the new provider exemption, was used to dispose of its request. PRM sec. 2533.1.B.3 states that the new provider exemption may be granted to a relocated provider only if the SNF relocates to a different state-defined HSA. Paragon relies primarily on the fact that a HCFA witness at the PRRB hearing admitted that the agency applied this new standard in rejecting MSC's application.

However, the evidence does not support Paragon's position. What the HCFA witness said is irrelevant to our review, since the PRRB's adjudication stands as the final decision of the Secretary under 42 U.S.C. sec. 1395oo(f)(1). The PRRB simply did not apply the standard contained in PRM sec. 2533.1.B.3. The PRRB's discussion of MSC's request for new provider status as a relocated provider never mentions the fact that Shores and MSC are both located in HSA Number Two. Instead, the opinion relies on the fact that "practically 100 percent" of MSC's admissions come from the same cities and towns as Shores' admissions. Thus, the PRRB did not retroactively apply PRM sec. 2533.1.B.3.

2. Arbitrary and capricious.

Paragon's next argument is that the same-cities-and-towns standard is arbitrary and capricious since it contra dicts the language of PRM sec. 2604.1. That PRM section states that relocation "a relatively short distance within a metropolitan area" can be sufficient for new provider status. Paragon claims that the same-cities-and-towns standard means that a provider that moves within a metropolitan area cannot qualify for new provider status, contradicting this portion of the PRM's text.

We reject Paragon's textual argument. A metropolitan area can contain many different municipal corporations. If a provider primarily serving one town relocates within the same metropolitan area to a different town and begins to serve mostly residents of the new town, then that relocated provider could attain

new provider status under the Secretary's interpretation of PRM sec. 2604.1. Thus, there is no contradiction between stating that movement within a metropolitan area can be sufficient for granting new provider status while also dictating that the new location must serve patients from different cities and towns than the old location.

Paragon also argues that the same-cities-and-towns standard is arbitrary since it does not take account of the fact that such incorporated areas can vary widely in size. That the standard applied by the PRRB treats disparately sized towns and cities the same is true, but agencies are permitted to rely on broad categorizations that may not perfectly reflect the underlying facts. Cf. Heckler v. Campbell, 461 U.S. 458, 467-68 (1983) (holding that using guidelines rather than a completely individualized inquiry to determine what kinds of jobs a disabled person can perform is not arbitrary or capricious). The same-cities-and-towns standard has a reasonable connection to determining whether a substantially different inpatient population is being served by a relocated provider, and is more efficient and less costly than a more detailed method.

3. Substantial evidence.

Paragon's next argument is that the PRRB's decision is not supported by substantial evidence. Paragon cites patient referral and zip code data to support its claim that MSC was serving a substantially different inpatient population from Shores'. Paragon's contention here seems to be premised on the same-cities-and-towns standard being invalid. However, we have already upheld that standard, and so the only question for purposes of substantial evidence is whether MSC's patients came from the same cities and towns as Shores'. The PRRB found that patients for both facilities came overwhelmingly from Milwaukee, and Paragon has not challenged this finding. Therefore, the PRRB's decision is supported by substantial evidence.

III. Conclusion

Seminole Rock deference is owed to the

Secretary's construction of 42 C.F.R. sec. 413.30(e). Relying on the operating history of the transferor of CON rights to deny the new provider exemption to the transferee is not plainly erroneous. Using the same-cities-and-towns standard to find that a relocated SNF is not serving a substantially different inpatient population is not arbitrary or capricious. Since the Secretary's interpretations are reasonable, we Affirm the district court's decision upholding the PRRB's decision denying new provider status to MSC.

FOOTNOTES

/* Pursuant to Fed. R. App. P. 43(c), Tommy G. Thompson is automatically substituted for the original defendant, Donna E. Shalala.

/1 After filing the instant action, Paragon changed its name to Mariner Post-Acute Network, Inc. This opinion will use appellant's name at the time it commenced the case.

/2 After MSC's request, the language defining a new provider was modified by replacing "provider" with "SNF" and moved to 42 C.F.R. sec. 413.30(d). We will refer to the language and location of the older version in effect when MSC applied for the exemption.

/3 PRM sec. 2604.1 was removed from the manual after MSC applied for its exemption and has been re-placed by PRM sec. 2533, which is substantially different, as partially described below in Part D.1.

/4 We wish to make clear that, for the reasons provided in the preceding discussion, we find that the Secretary has consistently interpreted 42 C.F.R. sec. 413.30(e) and did not reverse a prior interpretation in denying MSC's request. If the parties' submissions had demonstrated that the Secretary had in fact reversed course, we would be confronted with a different case pre-senting a number of issues we need not address. For example, in such circumstances, the interpre-tive change could be considered arbitrary and capricious if it "does not take account of legit-imate reliance on [the] prior interpretation." Smiley, 517 U.S. at 742. Similarly, since MSC opened prior to HCFA's 1995 decisions establish-ing the interpretation at issue here, the Sec-retary's current interpretation could have been impermissibly retroactive if MSC would have been considered a new provider under a prior interpre-tation of the regulation. Id. at 744 n.3; Bowen v. Georgetown Univ. Hosp., 488 U.S. 204 (1988).

Finally, we need not consider the D.C. Circuit's position that to change a previously established interpretation of a regulation an agency must follow notice and comment procedures. See Alaska Prof'l Hunters Ass'n, Inc. v. FAA, 177 F.3d 1030, 1033-34 (D.C. Cir. 1999); Paralyzed Veterans of Am. v. D.C. Arena L.P., 117 F.3d 579, 586 (D.C. Cir. 1997). But see Warder v. Shalala, 149 F.3d 73, 81-82 (1st Cir. 1998) (holding and collecting cases stating that notice and comment is not required solely because a new interpretive rule contradicts an old one).

/5 Beginning on July 1, 1998, SNFs are reimbursed on a prospective payment system. 42 U.S.C. sec. 1395yy(e).