**MARYLAND GENERAL HOSPITAL, INCORPORATED, d/b/a Transitional Care Center, Plaintiff–Appellant,**

v.

**Tommy G. THOMPSON, Secretary, United States Department of Health and Human Services, Defendant–Appellee.**

No. 01–2012.

United States Court of Appeals, Fourth Circuit.

Argued May 7, 2002.

Decided Oct. 9, 2002.

---

**ARGUED:** Carel Theilgard Hedlund, Ober, Kaler, Grimes & Shriver, P.C., Baltimore, Maryland, for Appellant. Paul Edwin Soeffing, Office of the General, Centers for Medicare and Medicaid Services Division, United States Department of Health and Human Services, Baltimore,

Maryland, for Appellee. **ON BRIEF:** James E. Edwards, Ober, Kaler, Grimes & Shriver, P.C., Baltimore, Maryland, for Appellant. Alex M. Azar, II, General, Sheree R. Kanner, Associate General, Henry R. Goldberg, Deputy Associate General for Litigation, Marcus H. Christ, Jr., Office of the General, Centers for Medicare and Medicaid Services Division, United States Department of Health and Human Services, Baltimore, Maryland; Thomas M. DiBiagio, United States Attorney, Roann Nichols, Assistant United States Attorney, Baltimore, Maryland, for Appellee.

Before WILLIAMS, TRAXLER, and GREGORY, Circuit Judges.

Vacated and remanded with instructions by published opinion. Judge TRAXLER wrote the majority opinion, in which Judge WILLIAMS joined. Judge GREGORY wrote a dissenting opinion.

## OPINION

TRAXLER, Circuit Judge.

Maryland General Hospital ("MGH") appeals from the district court's order upholding the decision of the Secretary of Health and Human Services to deny MGH a "new provider" exemption to the Medicare program's caps on reimbursement for routine service costs. *See* 42 C.F.R. § 413.30(e) (1996).[1] We vacate the district court's order and remand with instructions for the court to enter judgment in favor of MGH.

### I.

### A.

Under the Medicare program, skilled nursing facilities ("SNFs") are entitled to

reimbursement from the federal government for the reasonable costs of providing services to Medicare patients. *See* 42 U.S.C.A. § 1395x(u), (v)(1)(A) (West Supp. 2002). There are, of course, numerous exceptions to and limitations on that reimbursement, including certain caps imposed on the reimbursement for routine service costs. *See* 42 U.S.C.A. § 1395yy(a) (West Supp.2002). Congress, however, has expressly authorized the Secretary to establish appropriate exemptions and adjustments to these limits on routine costs. *See* 42 U.S.C.A. § 1395yy(c) (West Supp.2002). One such exemption established by the Secretary is the exemption for new providers of skilled nursing services, which allows higher reimbursement rates for the first two years of operation. *See* 42 C.F.R. § 413.30(e). The new provider exemption thus "allow[s] a provider to recoup the higher costs normally resulting from low occupancy rates and start-up costs during the time it takes to build its patient population." *Paragon Health Network, Inc. v. Thompson,* 251 F.3d 1141, 1149 (7th Cir. 2001) (internal quotation marks omitted).

### B.

The establishment and operation of skilled nursing facilities and other health care facilities in Maryland, as in most states, requires navigation through a complex maze of statutes and regulations. But for purposes of this case, it suffices to say that a "certificate of need" is required for the operation of a skilled nursing facility, and the certificate of need limits the number of beds that the facility may operate. Under certain circumstances, howev-

---

1. When this action commenced, the "new provider" exemption was found at 42 C.F.R. § 413.30(e) (1996); it is now found, in slightly revised form, at section 413.30(d) (2001).

The references in this opinion to section 413.30 are to the 1996 version of the regulation.

er, facilities in Maryland have the right to put as many as 10 additional beds into operation, without acquiring a new certificate of need. *See* Md.Code Ann., Health Gen. II § 19–120(f), (h)(1), (h)(2)(i) (Supp. 2001). These additional beds are generally referred to as "waiver beds." *See* Brief of Appellant at 5, n. 3.

In 1994, MGH established the "Transitional Care Center," a hospital-based skilled nursing facility. Prior to that time, MGH had not operated such a facility. To get the Transitional Care Center up and running, MGH purchased from three skilled nursing facilities the right to operate 24 beds. The facilities from which MGH purchased the bed rights were not connected or related to MGH in any way. The contracts between MGH and the selling facilities anticipated that the beds being sold to MGH would be "operational" beds—that is, beds that were in use by the selling facilities and authorized by their certificates of need. But when the Maryland Health Resources Planning Commission approved the transaction, it characterized the transaction as involving the transfer of waiver beds rather than operational beds.

MGH thereafter applied for the "new provider" exemption. After going through several layers of review within the Department of Health and Human Services, MGH's request was denied. MGH then sought review of the Secretary's decision by the district court. *See* 42 U.S.C.A. § 1395oo(f)(1) (West Supp.2002) (providing for judicial review of final reimbursement decisions by the Secretary). On cross-motions for summary judgment, the district court concluded that the Secretary's decision was based upon a reasonable interpretation of section 413.30(e). The court therefore denied MGH's motion and granted the Secretary's motion. This appeal followed.

## II.

### A.

■ The Medicare Act specifies that judicial review of reimbursement decisions is to be governed by the familiar standards of the Administrative Procedure Act. *See* 42 U.S.C.A. § 1395oo(f)(1). Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A) (West 1996). When the question before the court is whether an agency has properly interpreted and applied its own regulation, the reviewing court must give the agency's interpretation "substantial deference." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). But "[d]eference, of course, does not mean blind obedience," *Garvey v. NTSB*, 190 F.3d 571, 580 (D.C.Cir.1999), and no deference is due if the agency's interpretation "is plainly erroneous or inconsistent with the regulation," *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381 (internal quotation marks omitted).

### B.

■ The new provider exemption is fairly straightforward. It provides that

[e]xemptions from the limits imposed under this section may be granted to a new provider. A new provider is a provider of inpatient services that has operated as the type of provider (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than 3 full years....

42 C.F.R. § 413.30(e). Section 413.30(e) does not define "provider," but the structure and wording of the regulation suggest that the provider is the business entity or

institution providing the skilled nursing services. This reading is consistent with the meaning attached to a similar term in another part of the Medicare Act. *See* 42 U.S.C.A. § 1395x(u) (defining "provider of services" as "a hospital, critical access hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, [or] hospice program"). This business-entity-specific reading of the regulation is also supported by the explanation of the "new provider" exemption contained in the version of Medicare's "Provider Reimbursement Manual" ("PRM") in effect at the time MGH purchased the beds:

A new provider is an *institution* that has operated in the manner for which it is certified in the program (or the equivalent thereof) under present and previous ownership for less than 3 full years. For example, an *institution* that has been furnishing only custodial care to patients for 2 full years prior to its becoming certified as a hospital furnishing covered services to Medicare beneficiaries, shall be considered a "new provider" for 3 full years from the effective date of certification. However, if an *institution* had been furnishing hospital health care services for 2 full years prior to its certification, it shall only be considered a "new provider" in its third full year of operation, which is its first full year of participation in the program.

Although a complete change in the operation of the *institution,* as illustrated above, shall affect whether and how long a provider shall be considered a "new provider," changes of the *institution's* ownership or geographic location do not in [themselves] alter the type of health care furnished and shall not be considered in the determination of the length of operation.

PRM § 2604.1 (emphasis added). These repeated references to an "institution" indicate that application of the new provider exemption depends upon the ownership and operation of the business entity that is providing the skilled nursing services. There is no dispute that neither MGH nor any previous owner of MGH had provided inpatient skilled nursing services before the Transitional Care Center was established. Thus, it would appear that MGH meets the requirements for a "new provider" as set forth in 42 C.F.R. § 413.30(e).

The Secretary, however, insists that MGH is not a new provider because the "waiver beds" were previously owned by unrelated skilled nursing facilities that had been operating for more than three years. According to the Secretary, MGH's Transitional Care Center

was created by purchasing the right to operate nursing home beds formerly held by three existing SNFs. Thus, a change of ownership of these 24 beds created [the Transitional Care Center]. Under the Secretary's rules, one must look to whether the past owner of these beds operated as a SNF for three or more years. . . . There is no dispute that each of the prior owners of these beds operated as an SNF for more than three years. Therefore, MGH does not qualify for an exemption to the cost limits.

Brief of Appellee at 26 (internal quotation marks omitted).

We find this argument to be rather remarkable. Section 413.30(e) quite plainly focuses on the "newness" of the provider institution itself, a reading with which the Secretary purports to agree. *See* Brief of Appellee at 25 (stating that when determining whether the new provider exemption is applicable, the Secretary "looks at the operation of the *institution* under both past and present ownership as required by the regulation" (emphasis added)). When

applying the exemption in this case, however, the Secretary has not focused on the "newness" of the institution providing the services, but has instead focused on the "newness" of one particular asset of that institution. Such an approach could be sustained only if section 413.30(e) were ambiguous and the Secretary's interpretation reasonable. *See Martin v. Occupational Safety & Health Rev. Comm'n,* 499 U.S. 144, 150–51, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) ("In situations in which the meaning of regulatory language is not free from doubt, the reviewing court should give effect to the agency's interpretation so long as it is reasonable." (internal quotation marks and alteration omitted)).

The Secretary points to *Paragon Health Network, Inc. v. Thompson,* 251 F.3d 1141 (7th Cir.2001), in which the Seventh Circuit found the term "provider" as used in section 413.30(e) to be ambiguous. In that case, Paragon Health Network, Inc. opened a new skilled nursing facility and transferred the rights to operate 35 beds from another Paragon-owned skilled nursing facility. The Seventh Circuit concluded that "provider" was ambiguous as used in section 413.30(e) because it might sometimes be difficult to determine when certain internal changes to an institution would be enough to give rise to a "new provider":

> [I]f a facility fires all its staff and hires a new one, but makes no other changes, an ordinary user of the English language probably would consider the SNF with the new staff to be the same "provider" as it was before. Similarly, a SNF that replaced all of its old equipment with new models would still be the same "provider" as it was before the modernization. Even if a SNF both fired its staff and replaced all of its equipment, one might still call it the same "provider" if the administration and physical plant remained the same.

> Of course, if all the various things that make up a SNF were new in the sense that they had not been part of another facility, then one would have to call that SNF a "new provider." Conversely, if a nursing facility did not change any of its aspects, it would unquestionably continue to be the same provider rather than a new one. The difficulty in drawing a line between these two extremes is what makes the word "provider" ambiguous as used in the regulation.

*Paragon,* 251 F.3d at 1148. Because it found "provider" to be ambiguous, the court found reasonable the Secretary's denial of the new provider exemption based on the transfer of the beds. *See id.* at 1148–50.

In our view, the court's approach in *Paragon* is problematic. First, the fact that it might be difficult to draw a statutorily created line in a case with unusual facts does not mean that ordinary terms used in the statute suddenly become ambiguous. Moreover, as the district court observed in *Ashtabula County Medical Center v. Thompson,* 191 F.Supp.2d 884 (N.D.Ohio 2002), the difficulties that the Seventh Circuit believed its hypotheticals illustrated largely do not exist when "provider" is understood to mean the institution or facility providing the services:

> Focusing on the nature of the word "provider," the very series of hypotheticals posed by the Seventh Circuit leads to the conclusion that that term is unambiguous. The first three scenarios posited by the court are examples of one institution taking certain actions that fail to create any new institution, and the court sensibly concluded that these actions would not result in the creation of a "new provider": "a facility" fires all its staff and hires a new one; "a SNF" replaces all of its old equipment; "a

SNF" both fires all its staff and replaces its old equipment, but retains the same administration and physical plant. In each of these examples, some institution ("a facility" or "a SNF") changes some—maybe even many—of its characteristics, but remains in existence as that same institution, without giving rise to any new institution. In the court's final hypothetical, however, "all the various things that make up a SNF" are new, and the court rightly concluded that such a scenario would evidence the creation of a "new provider." In this case, the Seventh Circuit described not just one facility that changes certain of its characteristics but ultimately remains the same institution; rather the court put forth a scenario involving a second, distinct entity where all the various things that make up a SNF are new. Perhaps the old institution is gone, and perhaps not, but that is of little consequence. The question is whether a second, new institution—a "new provider"—has come into existence, and in the court's final hypothetical, one clearly has.

*Ashtabula,* 191 F.Supp.2d at 892 n. 8. Because the Seventh Circuit effectively found "provider" to be ambiguous by ignoring the ordinary meaning of that term, we find the court's analysis to be unpersuasive.

Notwithstanding the absence of a definition of "provider," we simply cannot conclude that section 413.30(e) is ambiguous. Given the ordinary meaning of the word "provider" and the manner in which it is used in the regulation, section 413.30(e) can only be understood as focusing on the business institution that is providing the skilled nursing services. If that institution, whether under its current or prior ownership, has operated as a skilled nursing facility for more than three years, then it is not entitled to the new provider exemption. If that institution under current or prior ownership has *not* previously operated as a skilled nursing facility, then it is entitled to the new provider exemption, even if the institution has purchased some of its assets from skilled nursing facilities that have operated for more than three years. *See Ashtabula,* 191 F.Supp.2d at 893 (concluding that "the term provider refers to the institution applying for the exemption ... not merely to its intangible characteristics or attributes" and holding that a newly created facility was entitled to the new provider exemption notwithstanding the institution's purchase of certificate of need rights from an unrelated SNF). Because MGH under any ownership had not previously operated a skilled nursing facility when it applied for the exemption, we conclude that MGH qualifies as a "new provider" under section 413.30(e).[2]

2. This conclusion is in no way dependent upon the status of the beds purchased by MGH or upon other intricacies of Maryland's health care regulatory scheme. That is, because section 413.30(e) focuses on the past and present ownership of the business institution rather than the past and present ownership of the beds, MGH qualifies for the new provider exemption whether or not the beds are properly classified as "waiver beds" or operational beds and whether or not MGH would have received a certificate of need had it sought to establish its Transitional Care Center in some other manner. We recognize that MGH does not make this precise argument in its brief. MGH insists that it is entitled to the new provider exemption, but it also states that it would not be entitled to the exemption if operational beds had been transferred. Nonetheless, MGH's appeal has adequately presented to this court the question of the correct interpretation of section 413.30(e). MGH's inaccurate statement of one aspect of this purely legal question, therefore, does not affect our responsibility to properly interpret the regulation. *See Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) ("When an issue or claim is properly before the court, the court is

## III.

■ In sum, we conclude that "provider" as used in section 413.30(e) unambiguously refers to the business institution providing the skilled nursing services. It therefore follows that the regulation permits consideration of the institution's past and current ownership, but not the past and current ownership of a particular asset of that institution. The Secretary's interpretation, however, equates the ownership of an institution providing skilled nursing services with the ownership of a particular asset of that institution. Since there is no language in the regulation that would permit the denial of the exemption because an asset of the new institution was previously owned by an unrelated SNF, the Secretary's interpretation is inconsistent with the plain language of the regulation and cannot be allowed to stand.[3] *See Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988) (explaining that a reviewing court should be "hesitant to substitute an alternative reading for the Secretary's [reading of his own regulation] unless that alternative reading is compelled by the regulation's plain language"); *see also* 5 U.S.C.A. § 706(2)(A) (requiring a reviewing court to "set aside agency action, findings, and conclusions" that are "not in accordance with law").

The Secretary's focus on the ownership of the beds may well be reasonable when considered against the realities of the skilled nursing industry. For example, the Secretary might reasonably believe that the new provider exemption should be applicable only when a new facility increases the options available to the community it serves by increasing the number of beds actually in use in that community. And we realize that, as is implicit in the Secretary's argument, the right to operate beds is perhaps the most important part of a skilled nursing facility, so that the transfer of beds takes on special significance.

Nonetheless, while the reasonableness of an agency's interpretation of a regulation is important if the regulation is ambiguous, an interpretation that is inconsistent with the plain language of an unambiguous regulation cannot be upheld simply because the interpretation, standing alone, seems reasonable enough. If section 413.30(e) fails to adequately address the considerations the Secretary believes important when determining whether the new provider exemption should be applied in any

---

not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.").

**3.** In 1997, PRM § 2604.1 was replaced by PRM § 2533.1, which is substantially different and which arguably supports the Secretary's position. *See* PRM § 2533.1(E)(1)(b) (giving as an example of when the new provider exemption should be denied a situation in which "an institution ... purchases the right to operate (i.e., a certificate of need) long term care beds from an existing institution ... that has or is rendering skilled nursing or rehabilitative services to establish ... a long term care facility"). Because section 2533.1 did not exist at the time of the transactions giving rise to this case, we do not believe it is applicable. Moreover, the provi-

sions of the PRM are treated as interpretive rules, *see Shalala v. Guernsey Mem'l Hosp.,* 514 U.S. 87, 101–02, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995), and thus are entitled to "some deference," but only to the extent that they represent a "permissible construction" of the relevant statute or regulation. *See Reno v. Koray,* 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (internal quotation marks omitted). Because section 413.30(e) can only be interpreted to allow consideration of the ownership of the institution seeking the new provider exemption, and not the ownership of the beds acquired by that institution, the example set forth in PRM § 2533.1(E)(1)(b) does not appear to represent a permissible construction of section 413.30(e).

given case, then the Secretary should amend the regulation; he cannot reach the desired result by interpreting the regulation in a way wholly unconnected to the regulation's plain language.

In this case, the Secretary's interpretation is altogether untethered from the plain language of the regulation. We therefore reject that interpretation, and we conclude that MGH is entitled to the "new provider" exemption set forth in section 413.30(e). Accordingly, we vacate the district court's order granting summary judgment to the Secretary, and we remand with instructions to enter judgment in favor MGH.

*VACATED AND REMANDED WITH INSTRUCTIONS.*

GREGORY, Circuit Judge, dissenting.

Unlike the majority, I find that the Secretary's denial of Maryland General Hospital's ("MGH") application for an exemption from cost limits under the Medicare program was based upon a reasonable interpretation of the regulation set forth in 42 C.F.R. § 413.30(e)(1996). Therefore, I respectfully dissent.

I.

In Maryland, a hospital desiring to operate a skilled nursing facility ("SNF") must first secure a "certificate of need" ("certificate") from the Maryland Healthcare Commission ("Commission"). Md.Code Ann., Health Gen. I § 19–20. The purpose of the certificate is to track and limit the State's capacity for skilled nursing services. The Commission has the authority to issue a certificate for new beds if it finds that additional beds are needed to provide adequate care for the surrounding community. As an alternative, a SNF seeking a certificate may purchase rights to operate beds from existing SNFs. Because the purchase of existing rights does not add to the total inventory of beds statewide, the Commission will issue a certificate for purchased beds without a new finding of need.

In June 1994, MGH agreed to purchase ten beds from Villa St. Michael, six beds from Granada Nursing Home, and eight beds from Wesley Home (collectively "the Selling Providers"). The agreements between MGH and the Selling Providers called for the purchase of "operational" beds. The parties understood that the Selling Providers were to then replenish the sold beds by exercising their rights to "waiver" beds. On August 2, 1994, MGH submitted a certificate of need application to the Commission to obtain approval for a 24–bed hospital-based SNF. MGH's certificate was approved by the Commission on July 11, 1995. For reasons not entirely clear from the record, the Commission reclassified the purchases from the Selling Providers as purchases of waiver beds, and the certificate was issued based on that reclassification. MGH did not object.

II.

Section 1395oo(f), Title 42 of the United States Code, provides for judicial review of final agency decisions on Medicare provider reimbursement disputes, and instructs the reviewing court to apply the relevant provisions of the Administrative Procedure Act ("APA"). Under the APA, agency action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(A); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–15, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Secretary's interpretation of his own regulation is entitled to substantial deference, and "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504,

512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (internal quotation marks and citations omitted).

### III.

As required by the regulation, the Secretary considers the "previous ownership" of the certificates in determining the length of time a provider has "operated." 42 C.F.R. § 413.30(e) (1996). If the prior owner was providing equivalent services, and the potentially new provider was established through the transfer of some portion of the certificate rights underlying those services, the operating history of the prior owner "from which any [certificate of need] rights were obtained is imputed to the acquiring provider." *Paragon Health Network, Inc. v. Thompson,* 251 F.3d 1141, 1145 (7th Cir.2001). The Secretary maintains that certificate rights are such an integral part of SNF operations that the transfer of these rights is considered to be a "change in ownership," referred to by the Secretary as a "CHOW," rather than the creation of a new provider. *See* PRM § 1500.7. Because Villa St. Michael, Granada Nursing Home, and Wesley Home operated skilled nursing facilities since June 1, 1989, July 1, 1989, and May 7, 1996, respectively, MGH's length of operation under the regulation exceeded three years, requiring the denial of new provider status.

As a general matter, MGH accepts the reasonableness of the Secretary's approach to interpreting the regulation. Furthermore, MGH concedes that insofar as the Secretary's interpretation applies to "operational" beds, the interpretation is reasonable and entitled to deference. *See* Appellant's Br. at 35, 36 n. 12, 38–39.[1] Thus, the

sole issue before the Court is MGH's insistence that the Secretary's interpretation cannot be extended to waiver beds.

In making its challenge, MGH focuses on the word "operated" in the regulation. Since waiver beds, by definition, are not currently operating, MGH contends that the beds have not "operated" for three years. In essence, MGH equates the state-law category of "operational" with the federal requirement that the provider have "operated" for less than three years. MGH argues that there could not have been a CHOW because the Selling Providers' licenses were unaffected by the transfer.

The Secretary responds that MGH has misread the word "operated" in the regulation. The issue, of course, is not whether the specific beds operated for less than three years, but whether the "provider" operated for less than three years. Yet the focus on bed rights, according to the Secretary, is an attempt to infuse the undefined term "provider" with meaning. The bed rights are the critical link between two otherwise separate entities, and it is this link that gives rise to continuity of "provider" status. Thus, it is irrelevant that the beds had not previously been "operated." As for MGH's assertion that there has been no change in ownership, the Secretary argues that the impact of the transfer of certificate of need rights on the licensure of the Selling Providers is not the exclusive test for whether a CHOW has occurred; rather, the Secretary looks at the entire operations of the prior owners to determine whether a SNF was created through the purchase and relocation of a portion of other, preexisting SNFs.

---

1. The majority would ignore this critical concession by MGH. *See* Majority Op. at 346 n. 2. Generally, concessions made by litigants are binding on appeal. *See Hagan v. McNallen* *(In re McNallen* ) 62 F.3d 619, 625 (4th Cir. 1995). Thus, the Court errs in scrutinizing an interpretation of the Secretary that MGH has elected not to challenge.

Ultimately, it is the Secretary's task to give content to the term "new provider." Unlike the majority, I find that focusing on certificate of need rights is a reasonable exercise of interpretive discretion. *See, e.g., Chevron U.S.A. Inc. v. Natural Res. Def. Council Inc.,* 467 U.S. 837, 864, 866, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Secretary's reliance on the difference between existing rights (operational or waiver) and newly-created rights (based on a finding of need) supports the purpose of the new provider exemption, which is to provide assistance in the provision of new services by new entrants to the skilled nursing facility market. The transfer of certificate of need rights does not result in an increase in the overall number of beds available under the state certification scheme. Extending the exemption under these circumstances would therefore ill serve its underlying purpose.[2]

Given the centrality of certificate rights in defining the class of existing service providers under state law, it is quite reasonable for the Secretary to rely on these bed rights in giving meaning to related federal regulations. Deference is especially warranted when "the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. 2381 (quoting *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 697, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991)). Because Medicare is such a complex, regulatory program, this Court should decline to displace the Secretary's policy choices in favor of its own.

I would also find that the Secretary's rejection of a operational/waiver bed distinction is reasonable. It is of little consequence that the transferred beds had not been made operational. Waiver beds are available for service at the discretion of the owner of the waiver right. The owner's right to bring a waiver bed into operation is not significantly different from the rights the owner holds as to all other beds.

**2.** This analysis is in accord with that of the Seventh Circuit in *Paragon Health Network, Inc. v. Thompson,* 251 F.3d 1141 (7th Cir. 2001). In *Paragon,* the Secretary found that the transfer of operational bed rights rendered the exemption unavailable for the purchasing SNF facility. The SNF argued that the Secretary was plainly wrong to rely on the bed rights. The court explained the ambiguity of the term "new provider" as follows:

> [The purchasing SNF] is correct that a nursing "provider" is composed of many different attributes, but changing one or more of these characteristics does not mean that the SNF becomes a different "provider." For example, if a facility fires all its staff and hires a new one, but makes no other changes, an ordinary user of the English language probably would consider the SNF with the new staff to be the same "provider" as it was before. Similarly, a SNF that replaced all of its old equipment with new models would still be the same "provider" as it was before the moderniza-

tion. Even if a SNF both fired its staff and replaced all of its equipment, one might still call it the same "provider" if the administration and the physical plant remained the same. Of course, if all the various things that make up a SNF were new in the sense that they had not been part of another facility, then one would have to call the SNF a "new provider." Conversely, if a nursing facility did not change any of its aspects, it would unquestionably continue to be the same provider rather than a new one. The difficulty in drawing a line between these two extremes is what makes the word "provider" ambiguous in the regulation.

*Paragon,* 251 F.3d at 1148. The court accepted as reasonable the Secretary's interpretation that because certificate rights were a necessary and integral feature of operating as a provider and the transfer of certificate rights would not increase the overall amount of nursing services provided to the community, no new provider had been established. *Id.* at 1149.

Just as the owner may take operating beds out of service, so too can he bring waiver beds into service.

The whole point of buying and selling bed rights is, of course, to transfer the *right* to use. MGH has not demonstrated that a seller's use or non-use of the bed right affects the value of the right in any way. *See Maryland Gen. Hosp.*, 155 F.Supp.2d at 464–65. Simply put, the buyer values the right to use the bed, regardless of whether the bed has been used. The fact that some operational beds may not have actually been operated, but rather only administratively classified as ready for operation, makes the asserted distinction between waiver and operational beds even less persuasive.

Additionally, MGH's own actions make clear that there is no relevant or significant difference between operational beds and waiver beds. MGH initially sought to buy operational beds from the Selling Providers. It was only after the sale had been effectively finalized that the Commission reclassified the sale as involving waiver beds. The reclassification seems to have been motivated by administrative convenience, and did not effect a substantive change in MGH's operations. MGH was perfectly satisfied with the reclassification at the time, and now concedes that it would not have been entitled to the new provider exemption had the original classification not been changed. It can hardly be concluded that the Secretary's interpretation is unreasonable when MGH cannot show any substantive effect on their operations related to the reclassification of the beds.

## IV.

Congress has specifically delegated to the Secretary responsibility for determining when exemption from routine cost limits for skilled nursing facilities is warrant-

ed. 42 U.S.C. § 1395yy(c). The Secretary has fulfilled his obligation through regulation, 42 C.F.R. § 413.30(e), and has sought to enforce the regulation through an interpretation that is neither plainly erroneous nor inconsistent with the language of the regulation. Accordingly, the Secretary's interpretation "must be given controlling weight[.]" *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381. I, therefore, would uphold the Secretary's interpretation that MGH is not entitled to the "new provider" exemption set forth in § 413.30(e), and affirm the district court's order granting summary judgment to the Secretary. Accordingly, I respectfully dissent.